[Crim. No. 3762.   Second Dist., Div. One.   Feb. 16, 1944.]

THE PEOPLE, Respondent, v. CORA LEE GILBERT,
Appellant.

Joseph L. Fainer and Russell E. Parsons for Appellant.

Robert W. Kenny, Attorney General, and T. G. Negrich,
Deputy Attorney General, for Respondent.

YORK, P. J.—By an amended complaint containing two
counts, the defendants were jointly charged with the crimes
of grand theft and burglary, and the defendant Cora Lee
Gilbert was also charged with two prior convictions of the
crime of larceny.

Upon arraignment both defendants pleaded "not guilty"
to the offenses of grand theft and burglary, and defendant
Gilbert admitted the prior convictions.   Thereafter defendant

Wynn withdrew his plea of "not guilty" to the charge of burglary, pleaded "guilty" thereto, the court finding the offense to be burglary of the second degree, and made his application for probation, whereupon his case was continued to a later date, but the record does not disclose what disposition was made thereof.

Meanwhile defendant Gilbert went to trial before the court sitting without a jury and was found guilty of the offenses charged in both counts of the information, the court fixing the burglary charge as of the second degree. Thereafter said defendant moved for a new trial which was denied. The court ordered the sentences on the two charges to run concurrently and found there was not sufficient evidence to declare said defendant an habitual criminal.

This appeal is prosecuted by defendant Gilbert from the judgment of conviction as well as from the order denying her motion for a new trial.

Appellant urges (1) that the evidence is insufficient to sustain the conviction; (2) the court erred in permitting an officer to relate a conversation with appellant before the corpus delicti was established; and (3) the court erred in denying her motion for a new trial.

The record herein discloses that on February 24, 1943, E. Lasner, Incorporated, dealers in furs, maintained an office and showroom in downtown Los Angeles which was in charge of its manager, Leonard Bachelis, and one other employee, the company's secretary, Lois Porter. The office was located in front and opened through an archway into a large storeroom where the company's stock of furs hung on racks. On the day in question, defendant Wynn called and told Mr. Bachelis he had an appointment with a furrier by the name of Crissman who was going to help Wynn select a fur coat for the latter's wife. Crissman, who was known to Bachelis, did not keep the purported appointment and Wynn remained about an hour looking all around the showroom examining the furs accompanied by the manager Bachelis.

Early in the afternoon of the following day, defendant Wynn returned to the showroom accompanied by appellant and another woman, whom Wynn said was his wife, and stated to Mr. Bachelis, "I have come back to look at the furs. I want to get something for my wife." The three persons remained about fifteen or twenty minutes, during which time Mr. Bachelis showed furs to defendant Wynn and the other

woman, but was unable to produce the required size. Meanwhile, appellant Gilbert was walking about the showroom looking around and two or three times returned to the place where Bachelis was showing the furs to defendant Wynn and his so-called wife. Bachelis had no particular conversation with appellant, who was visible to him except for a few seconds when she was walking behind the fur racks. As they were leaving Mr. Bachelis expressed regret that he did not have a coat to fit defendant Wynn's wife, and suggested they might call at the shop of another furrier on the ninth floor of the same building. Mr. Bachelis left his office immediately after and was absent for about ten minutes. During this interval appellant Gilbert, defendant Wynn and the other woman returned and appellant asked Miss Porter for Mr. Bachelis' card, saying there were no furs upstairs and she would like to have his card. As soon as Mr. Bachelis returned to the office, he and Miss Porter started to take an inventory of the stock of furs and when it was completed the next morning, it was discovered that a two-skin silver fox scarf valued at $100 and a silver fox jacket valued at $185 were missing, Mr. Bachelis testified he had seen these two garments "just before the defendants came into the showroom" and that he did not give either of the defendants permission to take them.

On March 2, 1943, Mr. Bachelis again saw defendant Wynn and the appellant on the third floor of Bullock's Department Store, whereupon he called the house detective and the police department and followed defendants from the store. He was present when they were arrested by the police at the corner of Seventh and Hill Streets at 3 o'clock on said day.

Over the objection of appellant's counsel that no corpus delicti had been established, the testimony of B. W. Grant, one of the arresting officers, was admitted in evidence that appellant "offered us $500.00 to put her on the street. . . . She said her record was so bad, she had two prior arrests, couldn't stand one more, it would mean a long stretch and didn't want to be arrested. Officer Kopyteck answered and said, 'The price has gone up. She offers $500.00.' So I told her, 'Well, chicken-feed—— I wouldn't listen to an offer of a thousand.' " This witness also testified to a conversation he and officer Kopyteck had with appellant at the Lincoln Heights Jail on March 4, 1943: "We told the defendant Gilbert that we had been out with Mr. Wynn and that we had

asked him how we could recover the furs and he told us to talk to her and she could help us get them back. And we said we had talked to the owner of the furs and he would like to have them back and she said she didn't know where the furs were and couldn't say where the furs were now and she couldn't get them back, but she was willing to pay for them. We told her the furs were valued at $285 and she said she was willing to pay as much as $500 for the furs and also take care of us. It would be worth our while, she could get $1,200 for us. . . . We told her we were not interested in the money, we were interested in the furs. She said she didn't know how she could get hold of the furs. We asked her what had been done to the furs, if given to a friend, shipped out of town, or what, and she said, 'Get hold of Wynn, maybe he and his girl friend can help you.' She didn't know where they were."

On the same day said officers had a conversation with Wynn, and officer Grant testified Wynn said he did not know where the furs were because when he left the fur store he got in the back seat of the car and the two women in front; that he did not know where they went or what they did with the furs; that he would be willing to pay for the furs but he did not have the money himself, "but that he would see the women and they would take care of the furrier and us too." Said witness further testified that "on the 4th of March we asked him (Wynn) how Cora Lee Gilbert operated, we asked him if she used hooks, rubber bands or some contrivance about her person in which she could hold the merchandise up underneath her dress. He said no, she was heavy enough and she held the merchandise between her legs and it wouldn't fall out and she walked with it. . . . During the course of other conversations we asked her (appellant) if she used a hook or a rubber band. . . . We asked her if she used hooks or rubber bands or a contrivance to hold the merchandise that she took from the store, and she said no, she never used any kind of device at all." In response to the question (on cross-examination), "Never at any time did she tell you she took furs from this man, did she?," the witness Grant replied, "She did not." So far as the record discloses, the furs were never recovered.

Appellant took the stand in her own defense and testified that she went to the Bachelis fur store for the first time on February 25, 1943; that on the day before she met defendant

Wynn and arranged to drive him in her car to the fur store in the downtown district; that she took nothing from that store. ''I told the officers when they arrested me, I says, 'What for?' he says, 'Grand theft.' I says, 'Grand theft of what?' He said: 'Stolen merchandise.' So I said I haven't stolen any merchandise, I don't want to get arrested because I have a record. I told them that and that is all the conversation.'' On the way to the central police station, she made the statement: ''I still tell you I don't know anything about it, any furs''; that the thing to do was ''to get in touch with Charlie Wynn, because I don't know anything about any furs, and I said to keep from being arrested for it, I would be willing to even pay for the furs. . . . I didn't want to be arrested for the furs. I didn't want to get in any trouble involving any furs, I didn't know anything about that.'' When asked if she had offered the officers $500 to put her on the street, she denied that she made them any offer, ''I said I would be willing to pay for the furs, I didn't make any offer to pay any money.''

Defendant Wynn testified on behalf of appellant to the effect that he took the furs the first time he visited the Bachelis store, to wit, on February 24, 1943, and that he disposed of them before he met the appellant on the following day. He denied the context of the conversations testified to by the witness, Officer Grant.

In connection with her contention that the evidence is insufficient to sustain the conviction, appellant urges that the whole case against her ''rests upon the fact that she had a possible opportunity for committing the crime, in that she went to the furrier's store together with Wynn and the codefendant Johnson.''

From the foregoing résumé of the facts and circumstances which form the basis of the instant prosecution, it appears that the evidence upon which appellant was convicted consisted mainly of circumstantial evidence, and a review of the entire record reveals that the denial of appellant's motion for a new trial constituted an abuse of discretion.

Of course, there is no question that a motion for a new trial is addressed to the sound legal discretion of the trial court and its action will not be disturbed on appeal except where an abuse of discretion is clearly shown. In a very close case, such as the one here made out against appellant,

a denial of the motion made on the ground of newly discovered evidence might work a hardship as well as a possible miscarriage of justice. This is especially so, because of the fact that the newly discovered evidence, which does not come strictly within the class of cumulative evidence, would have the effect of contradicting the strongest evidence introduced against appellant. In fact, it is possible that a different judgment would have been rendered herein, had this so-called newly discovered evidence agreed with the statement thereof contained in the affidavits made in support of the motion for new trial.

For the reasons stated, the judgment, and the order denying appellant's motion for a new trial are reversed, and the cause remanded.

Doran, J., and White, J., concurred.