[Crim. No. 4144. Second Dist., Div. One. Oct. 17, 1947.]

THE PEOPLE, Respondent, v. CLARENCE RICHARDSON et al., Appellants.

Phil H. Curry for Appellants.

Fred N. Howser, Attorney General, and William James, Deputy Attorney General, for Respondent.

DORAN, J.—Charged in count one of the information with the offense of kidnapping for the purpose of robbery and in count two with the offense of robbery, defendants, who were adjudged guilty by a jury, appeal from the judgments that followed and from an order denying a motion for a new trial.

The appeal herein is based on:

"I. INSUFFICIENCY OF THE EVIDENCE TO SUPPORT THE JUDGMENTS OF CONVICTION.

"II. PREJUDICIAL MISCONDUCT ON THE PART OF THE DISTRICT ATTORNEY AT THE TRIAL OF THE CASE.

"III. PREJUDICIAL ERROR COMMITTED BY THE TRIAL COURT IN DENYING THE DEFENDANTS' MOTIONS FOR A NEW TRIAL."

Appellants' argument relating to the sufficiency of the evidence is based largely on the failure of the victim to identify the defendants "positively." The victim testified, referring to the defendants, "these men resemble the men very much that held me up"; "the one on the end, he looks

like the fellow that first ran to the car'' and, referring to the other defendants, ''they resemble the men. They had hats on and bandages around their mouths; it was kind of hard to definitely say, but they look like the men.'' ''Q. Would you say that they are men who had approximately the same complexion, color? A. Yes, about the same complexion and about the same size.''

Carl Q. Tinker, the victim of the robbery, was the owner of a drug store and on Christmas Eve had closed the store about midnight. Mr. Tinker testified in part as follows, ''I closed the store and went to get in my car, and I entered the car on the left-hand side and as I got into the car I heard someone running across the street, and I thought it might be someone after me, so I tried to close the door, but they ran to the door and pulled it open and said, 'Let me in the car,' and seemed to have a gun or something in their hand; and I was trying to get out of the car and they got in behind me, pulled—it is a two-door Ford sedan—and they pushed the seat up and got in behind me. Then my foot was outside, so he said, 'Get back in the car,' so he tried to shut the door. I said, 'I can't shut the door because my foot is outside,' so I got my foot back in the car and shut the door. Then, about that time I noticed two more men coming along the sidewalk on the other side of the car, and he said, 'Open that door, let the men in,' but I didn't open it, but he reached over and opened the door and let the other two men in. One got in the back and the other one set in the front seat with me. . . . Well, the fellow that was sitting next to me, he said, 'We want that money.' And then—I beg your pardon. Before he said that, he said, 'We want your gun,' they asked me for a gun. I told them I didn't have a gun, so they seemed surprised I didn't have a gun, and one said, 'Look in the glove compartment.' They looked in that for a gun. . . . Then, after they looked and didn't see a gun, they said, 'Now, we want the money'; and so I told them I didn't have much money with me; and he said, ''Well, we want the money that you have'; and he said, 'Where is the money if you haven't got it?' I said, 'Well, someone picked it up. I was expecting something like this might happen. I wouldn't keep a lot of money.' They said, 'Oh, yes, you have, and we are going to get it.' About that time the one in the back behind me stuck the gun to my neck and I could feel the gun pressing against my neck, and he said, 'If you don't do what we tell you to do, you are not going

to live to see Christmas.' . . . One of the men said, 'If a police officer comes up to this car you better tell a story or else we'll get you.' I said, 'What did you want me to tell him?' He said, 'You tell him a story all right to get us out of it or else we will let you have the lead before they get us.' So I told him, I says, 'I will do what you want me to do,' and I started to get out of the car. They said, 'No, don't you get out; you do what we tell you to do.' So they held me there about 40 minutes, I imagine, in the car, and so I began to pray they wouldn't harm me about that time, and the little fellow set next to me, he says, 'Let's get this over. I'm getting nervous'; and so they continued to sit there and they watched, looking back in the back. When I turned around, the two in back said, 'Don't turn around,' but I turned around anyway and they turned their head so I couldn't see them, looked out of the back of the car; so I looked forward again, kept looking forward because they told me not to turn around again. So finally the taller one of the trio, he got out of the car and told me to stay in the car, and he walked up toward the entrance to my store. Then they told me to get out. . . . They had remained in the car and told me to get out. I got out on the right side of the car next to the store, and they told me to wait and they got out behind me, and they also cautioned me before leaving the car if I called for help or anything, or made any signals to anybody passing, they would shoot me; so I walked on to the store, to the entrance—the other one was waiting up there—and I was walking somewhat fast. They said, 'Don't walk so fast,' the two with me, behind me, made that statement. When I got to the entrance to the store, they said, 'Now, don't let that burglar alarm ring, be sure and cut it off'; so I proceeded—I turned the burglar alarm off, and by that time I heard somebody coming down the street and so—well, I stalled a little about getting into the store, thinking it might be somebody knew me and they would help me; so when the man got to the corner they said, 'Hurry up and get in, get in the store.' I said, 'If you will leave me alone I will get in, but you make me nervous and I can't find the right key.' So the man stood there and said, 'How are you Doc?' I said, 'I'm all right,' just like that, there wasn't nothing else for me to say but that, the men were behind me; so I got into the store and they told me to go and get the money, the rest of the money. In the meantime they had taken the money I had on my person in the car and searched me for more money. . . .

"Two of the men I saw had guns. So the smaller one of the trio and the darker one followed me into the back room, which was the prescription room, told me that is where I had the money. So they told me to get the money, so I went back to the prescription room to get the money. It was dark and he made me turn the light on, the smaller one right behind me, and I turned the light on; and I had placed part of the money down in the cupboard, I hadn't checked the money, just put it down there, and as I took it out of the register and when I went to reach for it he jumped at me with the gun, like he was going to shoot me.

"Q. BY MR. HUDSON: He pointed the gun at you?

"A. Yes, the gun. I got the money out and gave it to them. They took that. They said, 'Now, we want the rest of it.' I says, 'That is all I have.' They demanded the rest of it again, so I reached in the drawer and pulled out some more bills I had there."

The victim was held in the car for about 40 minutes by defendants, then forced to open the drug store and, inside the store, was forced to produce what money was on hand. At least two of the defendants were armed; the light was turned on in the store. Defendants also stole a radio and a toilet set as well as other articles. The radio and toilet set were given as a present to a Mrs. Allen, the next day following the robbery, by defendant Richardson.

The defendants were arrested on suspicion shortly after the robbery. The three were in a car belonging to one of the defendants; three revolvers were found in the car. An investigation followed which resulted in the charges herein considered.

In the light of the foregoing, appellants' argument actually is concerned with the weight of the evidence rather than its sufficiency and in that regard it is well settled that such questions are for the jury's determination; as a matter of law, the evidence was sufficient. It should be noted in this connection that positive identification is not necessary; a witness is not required to testify to the exclusion of a doubt.

Appellants' contention that the district attorney was guilty of misconduct relates to a question of one of the defendants' witnesses with reference to a prior conviction which revealed that such conviction was only a misdemeanor. There was no motion to strike nor was there any request for

an instruction or admonition. The error does not appear to have resulted in any prejudice in the circumstances.

█ Finally, it is argued that the denial of defendants' motion for a new trial was error because the trial judge as a thirteenth juror should have held the evidence to be insufficient and granted the motion. In the circumstances there is no merit to such argument.

There are no prejudicial errors revealed by the record. The judgments and order are affirmed.

York, P. J., and White, J., concurred.