[Crim. No. 788. Fourth Dist. Oct. 15, 1953.]

THE PEOPLE, Respondent, v. JOSEPH MICHAEL SHAHEEN, Appellant.

Thomas Whalen and E. L. Bracklow for Appellant.

Edmund G. Brown, Attorney General, and Alan R. Woodard, Deputy Attorney General, for Respondent.

GRIFFIN, J.—Defendant was convicted by a jury of the crime of robbery in the first degree in that on February 11, 1952, by force and fear, he took $10,000 from the possession of one Percy Welch, which money was the property of Julius Kahn and Earl Brodie, owners of the Club Royal. It was also found at the time, that he was armed with an automatic pistol. He entered a plea of not guilty to the charge, admitted four prior convictions of felonies, and that he served terms in state prisons therefor.

On this appeal there is no question raised about the evidence not showing the offense was committed. The main complaint is that the evidence is insufficient to convict defendant of the crime charged and particularly as to his identification as the culprit.

The evidence connecting the defendant to the crime charged may be thus summarized: Early in the morning on February 11, a robber gained entrance to the Club Royal, which was a café and bar located at Third and C Streets in San Diego. He exhibited a gun to Welch, the colored night janitor, who was then the only occupant of the club. After backing Welch into a hallway the robber tied Welch's hands and legs with tape, told him to be quiet, and then entered the office of the club, pried open the safe, and removed $10,000 therefrom. He then told Welch that he had better not identify him or he would kill him and if he didn't he would get somebody to do it for him. The robber left. Welch worked his way to the street and the officers and proprietor were called. He gave the police his description of the holdup man as "a man with dark . . . needed a shave . . . kind of a moon face, with black hair and shining black eyes, weighing about 150 pounds," was around 50 years of age and between 5 feet and 5 feet, 3 inches tall. He testified he went to the police station to look at some pictures of certain individuals, but apparently did not identify any of them as being the picture of the culprit who robbed him. Later, in July and August, the officers obtained a picture of defendant and called Welch to the station and showed him several pictures, including that of defendant. Welch said that the photograph of defendant "looked like the man." The testimony is that he selected the defendant's photograph before any officer told him that it was defendant's picture. Welch requested that another "stand-up" photograph of defendant be obtained. Later the officer took the photograph to Welch at the place of his employment and one officer stated to Welch that "he knew it was the man" because "they got pretty good dope on him." It is true that Welch never made a positive identification of the defendant. On the other hand, he never said he was not the man.

It affirmatively appears that Welch was quite frightened the night he was accosted. He was made to back up with the loaded pistol pointed at him. He had an opportunity to observe the accoster. One ceiling light of about 50 watts was lit, as well as a small light back of the bar. The accoster

had on a dark-colored hat pulled down over his head and eyes, and only portions of his hair and face were visible to Welch. He was under admonition not to give an accurate description of the accoster. Apparently, from the statements of the trial court in denying a motion for new trial, the witness acted quite nervous while testifying in the presence of the defendant in the courtroom.

As to the identification of defendant and the circumstances and conditions under which Welch made the limited observation, his testimony, both direct and on cross-examination, may be thus summarized:

In a question propounded by the court as to whether or not the witness did or did not notice certain things that evening, Welch replied: "Judge, Your Honor, I was scared. I tell you I was so scared, I didn't think that I had no blood in my body for three or four days." He testified that the man who tied him up proceeded directly to the safe; that he seemed to know where it was and "to know his way around in there"; that he inquired of Welch, "Where is the safe, to my right?" and Welch said "Yes," and he commenced hammering on it; that defendant brought a little brown bag with him and carried the money away in it. When asked to describe the culprit Welch said he was wearing an overcoat and a dark hat, "needed a shave. . . . He was very hairy and very dark, and with long black whiskers." A dark hat was placed on Shaheen's head in the courtroom. Welch was asked to look at him and say if he resembled the man who held him up in the Club Royal, and he said: "Yes, he resembles him." Defendant was then asked to turn sideways and the witness stated: "Yes, he do resemble him." When asked if he thought the defendant was the man who held him up he stated: "I couldn't say that is the man, Your Honor, because I do not know. . . . I would like to say, myself, but I just cannot because I don't know. If I knew I would say he was." He then testified that he had not, in his lifetime, seen anyone who resembled the man who held him up as much as the defendant did, but it did seem to him that the robber had more hair than defendant had at that time, and that his skin seemed darker, but he couldn't see much of his hair for the pulled-down hat; that he could not observe everything too well "because I was afraid"; that the man's eyes were black and shiny . . . looked desperate and dangerous" to him; that at the police station and trial defendant was smooth-shaven and his skin looked

lighter than that of the culprit, but he could not say whether or not the darkness was due to sun-tan, but he thought the culprit "was born dark" but he knew he was not colored; that "his voice was rugged and sharp, sounded something like a foreign accent or broken English" and seemed to be different from the voice of the defendant when he was interviewed at the jail; that defendant appeared to him to have Jewish or Italian features.

The prosecution also produced the officers who returned the defendant from Ohio, where he was arrested about October 29, 1952. They related conversations had with him. Some conversation related to a picture of defendant which the officers had obtained in Ohio and defendant wanted to know where they secured it. Defendant asked the officers if they knew one Billie Layton, in San Diego, and the officers said they knew him as a gambler only. Defendant was silent for a moment and then said: "Well, I am sorting out the black peas from the green peas. . . . I might be able to come up with who fingered me." Defendant was asked whether or not he had been in San Diego and he denied ever being there or "pulling the job at the Club Royal." He stated he had been in Los Angeles. The officer told him he had heard that defendant had been "shook down" for the money in Chicago and defendant denied he had ever been in Chicago. In one conversation he stated that the Negro in San Diego would not be able to identify him and the officer said: "We haven't told you there was a colored person involved in this. You must know something about it or how would you know there is a colored man involved?" Defendant remarked that his attorney in Ohio told him. The officer stated that so far as they knew his attorney did not know, and he then remarked: "Well, I heard it in Toledo." There is evidence, however, that the California officers did relate the facts to the Ohio authorities but not in the presence of defendant's attorney. The officers then stated that they and defendant started a conversation as to the difference in penalties in Ohio and California for the crime of robbery, and also pertaining to second degree burglary. Defendant was informed that he was being returned on the charge of robbery, and the officer told the facts surrounding the commission of the crime with which defendant was charged. Defendant then remarked: "Why wasn't I charged with burglary? It sounds like burglary to me." The officers then testified that de-

fendant's color at the trial was a little lighter than it was when they picked him up in Ohio because he had more sun-tan, and said he was always playing golf and never wore a hat; that his hair was then a little "bushier" on the sides when they picked him up because he then needed a haircut. One officer stated that the defendant told him he had not been in California at all.

When they arrived in San Diego the officer told defendant that the discussion they had in regard to the penalties for burglary was not correct since he had the opportunity to look it up, and defendant was asked if he intended to plead guilty to the charge and waive a preliminary; that defendant replied he "didn't intend to plead guilty at this time, that he would let us know"; that defendant again insisted on knowing how the officers obtained his picture in Ohio; that when confronted with a photostatic copy of a contract of sale of an automobile to him in Los Angeles about January 14, 1952, defendant was asked if that was his contract. He was then asked how long he had lived in Los Angeles and he said about four months but did not remember his address. He was then asked if he did not live at the Tower Apartments and he stated he did. He was again told about the necessity of informing the district attorney of any contemplated plea of guilty and he replied that "he didn't intend to at this time." The officer then stated that about November 11th, he talked to the defendant in jail and told him they had a local problem which they were trying to clear up and if defendant would give them some help on it they would be able to arrange it for defendant to enter a plea of guilty to second degree burglary; that defendant stated he then had an attorney; that he didn't intend to "enter a plea at this time"; that if he wanted to change his mind he would have them contacted; that defendant did not speak with a foreign accent or broken English; that he was clean shaven when picked up in Ohio, and after three days on the train he noticed defendant had a dark beard sprinkled with quite a bit of gray.

The People then produced a patrolman doing duty on the vice squad in San Diego who testified that defendant was seen by him several times in the vicinity of the Club Royal, and he particularly remembered seeing him in the Royal Room of that club in the early part of February just before the robbery; that defendant was seated next to a known gambler and ex-bookmaker whom he knew; that when he

was shown defendant's photograph he remembered seeing him on that particular occasion; that his memory of this occasion was on account of his specific assignment to watch this place because of complaints of law violation about that time; that when he saw defendant he was wearing a hat on the back of his head; that he could not say whether or not he was clean shaven, but his complexion seemed darker than at the time of trial; and that his eyes were brown. The court then asked the officer if there was any question in his mind at that time as to whether or not it was the defendant who was in the club that night, and he replied: "No, sir, there is not."

Witnesses were called from Los Angeles who testified that defendant turned in a car and purchased another one about January 14, 1952, and agreed to make monthly payments of $90.44 thereafter; that a payment of $30.40 was made on February 14th, and on February 20th, defendant and his claimed brother-in-law came to the office and paid $140.88, paying the payments in advance in cash. The witness stated that both defendant and the claimed brother-in-law at that time were possessed of "rolls of bills . . . where he came from it would choke a horse," and that he saw "plenty of dough . . . that it might have been all ones or it might have been anything else." It was shown by the proprietor of the Tower Apartments of Los Angeles that defendant registered there on November 30, 1951, and his apartment was re-rented on February 9, 1952.

The defendant failed to testify on his own behalf. The only witness he produced was a lady who operated a café near the Club Royal. She stated she knew Welch, remembered the pounding in the café on the night of the robbery, and that she went to the scene afterward and heard Welch describe the culprit's voice as "sounding like a foreign accent . . . maybe Mexican, Italian or Jewish"; that after defendant's return from Ohio Welch told her the picture of defendant "resembled him but I am not sure" because "when he pointed the gun at me I was real scared"; that while in court on the first hearing Welch told her the defendant was not the man who held him up and that after the second trial Welch told her he saw a man on the street that closely resembled the defendant; that she called the jailer and was informed that defendant was still in jail. It appears that this witness did not testify at the first trial and was shown to be quite friendly

with Mr. Kahn and had never revealed these facts to him before that day.

Welch denied stating this to the witness and claimed he always told her that "I didn't know." On a motion for new trial the same contentions here presented were also presented by the defendant to the trial court and rejected.

Thus summarizing the evidence, Welch testified that defendant resembled the man who held him up, although he would not definitely state that he was the man. He did declare, however, that he had never seen anyone who resembled the man as much as the defendant. After seeing the pictures of defendant and identifying him as he did, Welch signed an affidavit prepared by the district attorney to the effect that he was positive the defendant was the man. Welch testified on more than one occasion that the robber had threatened to kill him if he did not give a bad description, and it does appear that he was quite frightened at the time of the robbery and apparently also at the trial. While Welch's testimony identifying the defendant might well have been much more definite, yet nowhere in the record is there a sworn statement by Welch that defendant was not the man. He specifically denied making such a contrary statement to the witness produced by defendant.

In arguing that the evidence is legally insufficient to support the verdict defendant relies principally upon *People* v. *Gibbons,* 93 Cal.App.2d 28 [208 P.2d 411], in which this court reversed a judgment of conviction for robbery·on the ground that the evidence of identification was legally insufficient. In that case the victim of the robbery testified very positively and on several occasions that the defendant was not the man, and in view of the unsatisfactory testimony of other witnesses a reversal resulted. In that case the defendant took the stand and denied being at the scene of the crime, established an alibi supported by three witnesses, and no element of fear pertaining to the victim's testimony about a description was shown.

For many persons, positive identification is difficult even where one is observed under normal conditions. ▉▉▉ The strength or weakness of the identification, the incompatibility of and discrepancies in the testimony, if there were any, and the uncertainties of the witnesses in giving their testimony were matters solely for the observation and consideration of the jurors in the first instance, and for the consideration of the trial court on motion for a new trial. This court may not

disturb such finding or the action of the trial court unless we can say, as a matter of law, that there was no evidence to support the conviction. In order to sustain a conviction it is not necessary that the identification of the defendant as the perpetrator of the crime be positive or in a manner free from inconsistencies. It is the function of the jury to pass upon the strength or weakness of the identification and the uncertainties of the witnesses in giving their testimony. Unless the evidence of identity is so weak as to constitute no evidence at all, this court cannot set aside the decision of the trial court. (*People* v. *Kittrelle,* 102 Cal.App.2d 149 [227 P.2d 38] ; *People* v. *Waller,* 14 Cal.2d 693 [96 P.2d 344] ; *People* v. *Addington,* 43 Cal.App.2d 591 [111 P.2d 356] ; *People* v. *Hightower,* 40 Cal.App.2d 102 [104 P.2d 378] ; *People* v. *Houser,* 85 Cal.App.2d 686 [193 P.2d 937] ; *People* v. *Soldavini,* 45 Cal.App.2d 460 [114 P.2d 415] ; *People* v. *Richardson,* 81 Cal.App.2d 866 [185 P.2d 47] ; *People* v. *Braun,* 14 Cal.2d 1 [92 P.2d 402].)

Applying the above rules to the instant case in the light of all the evidence adduced at the trial, there was ample evidence to support the verdict of the jury.

 The next point involves the instruction offered by the People and given reciting that it was not necessary that an identifying witness positively identify the defendant as the perpetrator of the crime to support a conviction if from an examination of all the evidence you are convinced beyond a reasonable doubt that the defendant was the perpetrator of the crime charged. It is argued that the instruction as given is an encroachment on the right of the jury to determine the credibility of the witnesses and the weight to be given to their testimony. The instruction as given was proper. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778] ; *People* v. *Richardson, supra.*) The function of the jury in this respect was adequately covered in other instructions.

Defendant asserts that the court having given the above instruction erred in refusing to give defendant's proffered instructions in the language of CALJIC Instructions Nos. 26 and 27, pp. 28-30, pertaining to evidence susceptible of two reasonable conclusions, and informing the jury that under such circumstances it was their duty to follow that which points to his innocence, and that where circumstantial evidence alone is relied upon the circumstances must be not only consistent with guilt but irreconcilable with any other rational conclusion, citing *People* v. *Koenig,* 29 Cal.2d 87, 92 [173

P.2d 1] ; and *People* v. *Hatchett,* 63 Cal.App.2d 144 [146 P.2d 469].

▇ The first instruction has been held applicable only in a case where the proof is all, or chiefly, circumstantial (*People* v. *Marvich,* 44 Cal.App.2d 858 [113 P.2d 223] ; *People* v. *Jones,* 61 Cal.App.2d 608, 626 [143 P.2d 726]).

▇ As to the second instruction, where the circumstantial evidence, as in the instant case, is merely incidental to and corroborative of the direct evidence, such an instruction should not be given. (*People* v. *Alexander,* 92 Cal.App.2d 230, 235 [206 P.2d 657] ; *People* v. *Jerman,* 29 Cal.2d 189, 197 [173 P.2d 805].)

Counsel for defendant sets forth 10 points which he alleges constituted prejudicial error by the trial judge. They pertain to certain evidence offered by the prosecution to impeach their prosecuting witness Mr. Kahn without laying the proper foundation, improperly cross-examining him as their own witness, interrupting the cross-examination of Welch, allowing testimony that defendant's brother-in-law also possessed a large sum of money when seen with the defendant when making payments on the car, the asking of questions of a certain witness by the court which the defendant claimed was for the purpose of rehabilitating his testimony, asking questions which were not proper examination or were leading, and allowing the district attorney to ask leading questions and refusing counsel for defendant permission to further cross-examine one of the officers in connection with a conversation with the defendant concerning penalties for robbery and burglary.

It is sufficient to say that we have read the entire record in this respect and conclude that the subject matter was immaterial, the cross-examination was proper, the evidence was admissible, or if erroneously admitted was harmless, that the questions propounded were proper even if some were leading, and that any limit placed on defendant's right of cross-examination was not prejudicial.

Counsel for defendant concedes that some of the complaints made of the errors of the trial court may seem inconsequential when considered alone but argues when all are considered together prejudicial error resulted.

While it might be argued that some of the complaints had merit, when the entire matter is considered as a whole, we conclude that no prejudicial error resulted. (Const., art. VI, § 4½.)

The claim of prejudicial misconduct on the part of the prosecutor involved questions propounded to his witness Mr. Kahn as to whether several people around his place of business did not ask him not to prosecute this defendant. Objection was sustained to the general line of questioning but the witness was allowed to give the name of one of such persons. Thereafter, the prosecutor asked the witness if he did not tell him that there was another man whose name he could not give, who talked to him about it. Objection was made to the question and sustained. Counsel for defendant demanded a mistrial which was denied. ▉ He now argues that the most serious complaint involved is in reference to the claimed misconduct on the part of the prosecutor in calling himself as a witness to testify to a claimed conversation had with counsel for defendant when the jury was out in the former trial, which conversation took place in the court's chambers in the absence of the defendant. Objection was made to the statement and the witness stated he wished to make an offer of proof. In the absence of the jury the offer of proof was made and the trial court properly sustained the objection. No prejudicial error or misconduct resulted. (*People* v. *Dillon,* 1 Cal.App.2d 224, 230 [36 P.2d 416].)

▉ Lastly, it is argued that the court erred in denying the motion for a new trial. Complaint is made that in considering the mental state of Welch in failing fully to identify the defendant, the trial court made the following observation:

"Now Percy (Welch), I saw him in both trials, and the first trial he was particularly scared. He shook like a leaf. He was sort of used to it in the second trial but he was still scared."

The court also stated that he noticed defendant's physical appearance during the trial and that judging from a photograph taken of defendant after the trial, his whiskers did make his face look a lot fuller, and when he did put on a dark hat it made him look darker. By consent of the court on the motion for new trial, pictures were taken of the defendant while in jail and after he had not shaved for several days so the court could observe his general appearance. At the trial the jury had the opportunity to observe the defendant, with the exception of his growth of whiskers, and judge whether the description given by the victim was proper. From the picture offered, and made a part of the record on this appeal, the jury might well have believed that the color of defendant's eyes was quite dark, that his beard was dark,

although tinged with gray, and that above all, he looked like some foreigner, and particularly of the Jewish extraction.

The trial court fully considered the affidavit of counsel for defendant, and the affidavit of one Helen Crowe, who stated therein that Welch stated to her, after the first trial, that he saw a man on the street who looked like the man who held him up because he looked so much like Shaheen, and that Welch said when defendant was returned here and he saw him in the flesh he knew he was not the man. This evidence, if produced, would have been but cumulative to that produced by defendant at the trial. The court fully considered all aspects of the grounds for the new trial and no doubt considered the testimony of Welch in contradiction of these affidavits. A motion for a new trial is addressed to the sound legal discretion of the trial court and its action will not be disturbed on appeal except where an abuse of discretion is clearly shown. (*People* v. *Gilbert*, 62 Cal.App.2d 933, 937 [145 P.2d 924] ; *People* v. *Henderson*, 79 Cal.App.2d 94, 124 [179 P.2d 406].) No such showing has here been presented.

Judgment and order affirmed.

Barnard, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied October 29, 1953.