Filed 4/10/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>RAFAEL B.D.R.,<br><br>　　　Defendant and Appellant. | A167246<br><br>(Alameda County<br>Super. Ct. No. 19CR011497) |

Defendant Rafael B.D.R. was sentenced to a six-year prison term for committing a lewd act upon a child under the age of 14 (Pen. Code, § 288, subd. (a)), and sending or exhibiting harmful matter to a minor (§ 288.2, subd. (a)(2)).[1] He was convicted of committing these crimes against Jane Doe when she was 11 years old. Jane is defendant's niece; her mother Janeth is the sister of defendant's ex-wife, Elizabeth.

On appeal, defendant contends that the trial court erred by denying his motion for a new trial based on newly discovered evidence that Elizabeth and Janeth devised a plan for Jane to falsely accuse defendant of abusing her. Because we find the trial court prejudicially erred when ruling on the new trial motion, we vacate the judgment and remand for further proceedings.

---

[1] Statutory references are to the Penal Code, unless otherwise indicated. Intending no disrespect, we use given names to refer to many individuals involved, both for clarity and to protect their privacy.

1

## FACTUAL AND PROCEDURAL BACKGROUND

The incident that gave rise to this case occurred on September 8, 2018 and was first reported to the police on July 23, 2019. Within a week of the report, a complaint was filed against defendant, he was arrested and then released on bail. Following the filing of an amended information, a jury trial was held in November and December 2022. The People called two witnesses, Jane Doe and her older sister Melissa. Defendant called no witnesses.

### *Excluded Witnesses*

The trial court granted the People's motions in limine to exclude testimony by two defense witnesses: defendant's 12 year-old son, John Doe; and Victoria, the maternal grandmother of both John Doe and Jane Doe.

The defense had proposed to elicit testimony from these other family members that Jane's mother, Janeth, had asked them to lie about defendant in order to "falsely implicate" him. As an offer of proof, the defense stated that John would testify that Janeth asked him to tell the police that defendant touched him in "inappropriate places," even though that had not happened. Defense counsel proposed to show that this conversation occurred before Janeth reported to the police that defendant had abused Jane. Victoria would testify that on the same day the police were contacted, Janeth asked her to lie to the police by stating that Jane Doe's behavior toward defendant changed after September 2018.

The trial court found that John Doe's testimony was potentially relevant to the defense theory that Jane Doe made up a story about defendant at the behest of Janeth, who harbored personal animus toward defendant. However, the court excluded John Doe's testimony under Evidence Code section 352, finding "no clear nexus" between "the complaining witness" and conversations Janeth had with John Doe. The

2

court reasoned there was no evidence Jane Doe even knew about the conversation between her mother and her cousin, and since Jane Doe was the complaining witness, it was her credibility that was at stake, not the credibility of her mother. Moreover, Janeth was not expected to testify, and allowing testimony about her lack of credibility would be unduly time-consuming and potentially prejudicial to Jane Doe. For the same reasons, the court excluded testimony regarding Victoria's conversations with Janeth.

**The Prosecution Case**

The People called Melissa as their first witness, and then Jane. At the time of trial Melissa was 19, and Jane was 15. In September 2018, they lived with their parents in an apartment complex in Oakland. Their aunt Elizabeth lived one floor up in the same complex, in an apartment with defendant and the couple's three children. The two families "saw each other very often" and "were very close."

**Melissa**

Melissa testified that on September 9, 2018, Jane asked to speak with her about something. Jane was nervous and upset, holding back tears. Melissa took her into the bathroom where she started crying and kept asking Melissa not to tell anybody about their conversation. Once Melissa calmed her down, Jane told her defendant had made her "uncomfortable" the previous night when she was at his apartment, helping to take care of his kids while their aunt Elizabeth was out with other family members.

Melissa told the jury what she recalled Jane telling her about the incident with defendant: Jane had gone to sleep in her aunt and uncle's bed, while defendant went to take a shower. After he came out of the shower and "clothed himself," defendant laid in the bed with Jane. They were talking and Jane was trying to go to sleep when defendant showed her an

3

"inappropriate video" that "might have involved people kissing," or Jane may have just told Melissa that it was "inappropriate and she felt uncomfortable." Jane told Melissa that defendant asked her if she knew what "sex" was, and when she said " 'no' " he "pointed out where it happened on her body." Defendant also touched Jane's leg and asked if she wanted to "cuddle." After Jane turned him down, defendant went to sleep on the couch.

Melissa testified that she recorded a portion of her conversation with Jane on her phone. She explained that she recorded only part of the conversation because she wanted to "listen to her first." She started recording once she realized she was going to have to tell someone about the incident because having the video would make it more likely people would believe Jane. Melissa acknowledged that Jane had lied to the family before. The audio recording, which was played for the jury, did not describe abusive conduct, but it captured Jane crying and sounding very upset as she made statements such as: " 'I am so scared. I don't know what to do. I don't want to see him. I am so upset.' "[2]

Melissa testified that eventually she did tell her mom about the incident with defendant, during a conversation that occurred about two months before they called the police in July 2019. At the time, Janeth was questioning Jane about why she was not doing her chores or going out and doing things. Melissa interjected that maybe Jane was experiencing mental health problems and not doing well in school because of personal issues she was dealing with, and then decided to tell Janeth about what happened with

---

[2] Prior to trial, the court overruled a defense objection to this audio evidence, admitting it as a spontaneous statement pursuant to Evidence Code section 1240. This evidence is not included in the appellate record, but the prosecutor recounted Jane's statements during the hearing on in limine motions.

4

defendant. When the defense questioned Melissa about Jane's personal problems, Melissa acknowledged she had read Jane's diary, which talked about how Jane was "suicidal" and felt unloved by her family, but did not mention defendant or the incident.

### *Jane Doe*

Jane testified that in September 2018 she often spent time with her aunt and uncle's family. She used to be close to her cousins, who are younger than she is, but at the time of trial she was unsure of their ages. She was not sure or did not remember how old she was or what grade she was in back in September 2018. She did recall being alone with defendant in his apartment and feeling scared.

Jane testified that the incident occurred on an evening when she had gone to defendant's apartment to help take care of her cousins while her aunt and parents went out to a casino for the evening. When Jane arrived at the apartment, her grandfather was there. At around 10:00 p.m., defendant arrived home, and Jane's grandfather left. Jane planned to sleep at the apartment until her aunt got home so that she could help defendant with the children. She remembered that she went to lie down on her aunt and uncle's bed, but she did not recall what she was wearing or if she got under the covers. She remembered that when defendant came into the room, he was wearing underwear, but she could not remember if he was wearing anything else. He laid next to her on the bed, "getting comfortable," and started asking her questions and telling her about his life in high school. He asked if Jane had a boyfriend and if she wanted to cuddle. Jane answered " 'no' " to both questions.

Jane recalled that she and defendant were both using their phones when he asked if she wanted to see a video his friend had sent him that was

5

"nasty and weird." Jane said " 'okay,' " and defendant played the video, which showed a car and two naked people. Jane did not understand what the people were doing when she saw the video, but she later came to understand that the people in the video were having sex. Jane recalled that defendant asked her not to tell anyone.

Jane testified that after the video, defendant asked if she "ever wanted to try that on top of the clothes only," and Jane told him " 'no.' " Jane remembered feeling his hand below her stomach, and that he was making a tapping motion. He also touched her leg. She did not remember if he touched the inside or outside of her leg but he did not "ever touch anywhere in between [her] legs." Then he said he was going to sleep on the couch. Jane was really scared and did not move for a long time. When her aunt Elizabeth got home, Jane did not tell her what had happened because she felt scared. The next day, she told her sister because she felt comfortable with her sister. Eventually she told her mom what happened, which "felt good," because her mom believed her.

Under cross-examination, Jane acknowledged that on the night of the September 8 incident, she texted back and forth with her mother about how the children were doing, and she did not text anything about wanting to leave. She did not text her sister, who was one floor away, and she did not attempt to leave the apartment before her aunt got home. Jane identified a photograph of defendant's one-bedroom apartment, which showed that his children's beds were in the same room and within a foot or two of the adult bed, where Jane testified the incident with defendant occurred.

Jane testified she was sure that the first time she told her mother about the incident with defendant was July 23, 2019, the same day they called the police. The next day, she participated in a videotaped interview.

6

During that interview, Jane said she had to tell her mother about the incident because she could not lie to her anymore.  When asked at trial if she believed defendant mistreated his wife Elizabeth, Jane said that she did not know.  She confirmed, however, that she "felt good" because she was helping to take "away a really bad guy" from her aunt.

### *Closing Arguments and Verdicts*

The prosecutor argued in closing that defendant had committed a lewd act on a child under the age of 14 and exhibited harmful matter to a minor.  Defendant was guilty of these charges, she argued, because both Jane and Melissa were credible witnesses.  The girls were obviously emotional, nervous and afraid.  But, the prosecutor emphasized, there was no "evidence in this case" of "any motivation on the part of Jane Doe to lie," no evidence "to suggest that she had any reason to lie about what happened."  The prosecutor also argued that inconsistent testimony about the time that had elapsed before Jane Doe's mother reported the incident to police was a "red herring" because there was no evidence to suggest that "any delay . . . resulted in any change of story, or any collusion or anything between Miss Doe and her mother."

The defense argued defendant did not molest Jane Doe or show her pornography, and that Jane was not honest about what happened between them.  Defense counsel argued that the prosecution's case depended on the credibility of their two witnesses because Jane Doe's diary from that time period showed the absence of a crime; her text messages showed the absence of a crime; and the audio recording from Melissa's phone contained no reference to defendant or any incident involving him.  Developing this theme, defense counsel highlighted perceived discrepancies in the prosecution evidence.

7

On December 8, 2022, the jury found defendant guilty of both charges after deliberating for approximately one court day. After discharging the jury, the court found true allegations that Jane Doe was a vulnerable victim, and that defendant took advantage of a position of trust. (§ 1170, subd. (b); Cal. Rules of Court, rule 4.421(a)(3) and (a)(11).) A sentencing hearing was set for January 24, 2023. At the People's request, defendant was ordered to surrender his passport pending sentencing.

***The New Trial Motion***

Prior to sentencing, defendant filed a motion for new trial based on newly discovered evidence. (§ 1181, subd. (8).) According to the motion, on January 4, defendant's ex-wife Elizabeth sent defense counsel an unsolicited email, disclosing critical new facts. In response to this email, defense counsel obtained a declaration from Elizabeth, which was attached to the motion to dismiss.

In her declaration, Elizabeth stated that defendant was "always an upset person," and was "always yelling" at her, her kids, and her nieces and nephews. This mistreatment made Elizabeth and Janeth angry at defendant. One day, Janeth found Elizabeth crying because defendant had mistreated her again, and Janeth told Elizabeth she had to get a divorce. Elizabeth agreed, but said she would not do it because she was afraid. Then, the sisters had an idea: "Janeth and I thought we're going to say that he committed a crime so that he would go to jail and be deported. That way I wouldn't care about getting divorced and I wouldn't be with him anymore. He would be far away where he wouldn't bother or yell at me anymore."

According to the declaration, Elizabeth and Janeth decided that the crime had to be that defendant molested the children. They considered saying that Elizabeth's children were the victims, but her children were very

8

young and were not going to lie. Then they decided Melissa would be the victim because she was older and "would know how to tell the police what we wanted." Elizabeth and Janeth spent two months "training" Melissa to say that defendant molested her and showed her porn because he wanted to have sex with her, but they felt that would not be "enough" to get him deported. Then Janeth suggested using Jane Doe as the victim because they had a recording they could use of an incident when defendant yelled at Jane Doe and "she ran out of the house," which Janeth said could be used as "proof he molested her."

Elizabeth stated that for two weeks before calling the police, she and Janeth trained Jane Doe to say that defendant showed her porn and masturbated on her. But when Jane gave her report she did not say that defendant masturbated. Defendant was arrested but released the next day and Elizabeth became concerned the plan was not going to work. She distanced herself from Janeth so defendant would think she was on his side and would not find out she was "involved." At some point, defendant told her that his lawyer had learned that Melissa told the police that Janeth had a plan to try to use defendant's children against him. Then Elizabeth completely distanced herself from Janeth because she was very afraid defendant would find out that Elizabeth was "part of that plan."

In explaining her reasons for coming forward, Elizabeth stated that she did not care about the outcome of defendant's case after obtaining a divorce, but she could not live with the "burden of guilt" on her conscience, that she needed to "tell the truth," and that she could not "overcome the fault" she had "in planning this case" with Janeth.

9

**Denial of New Trial Motion**

On January 24, 2023, prior to conducting the sentencing hearing, the court heard argument and ruled on defendant's new trial motion.

The defense argued that Elizabeth's declaration constitutes significant new evidence, as it shows that she orchestrated a fraud in order to have defendant wrongfully arrested so that he would be deported rather than Elizabeth having to go through a divorce. Defense counsel argued further, that when they investigated whether Jane Doe was lying about the event in question, they found nothing to suggest that Elizabeth was against their client. She had facilitated defendant's arrest by telling the police where to find him, but her explanation for calling the police was that she did not want defendant arrested in front of the children. They asked her "if she thought there were any reasons why [Jane Doe] would lie and she said, 'no.'" During their investigation, the defense did discover evidence that Janeth had attempted to get other family members to lie, but the court excluded that evidence from trial. Defense counsel argued that although the court's ruling was arguably correct when made—because at that time there was no link between the misconduct and Jane Doe's credibility—Elizabeth's revelation now provided that link and constituted new evidence that defendant was falsely accused.

The prosecution argued the defense had not been diligent in investigating the matter, which was relevant but not dispositive, as the ultimate question was whether the new evidence was significant. The prosecutor urged the court to exercise its wide discretion to deny the new trial motion on the ground that Elizabeth's declaration was not significant because it was "simply just not credible."

After the matter was submitted, the court made an initial ruling not to conduct an evidentiary hearing, stating: "I assume for purposes of your motion that if [Elizabeth] was brought to Court that she would testify consistently [with] what she put in that declaration. . . . So I am not in need of witness testimony and a motion for new trial doesn't require an evidentiary hearing. So I am confident that I have the information I need to make a ruling here."

As to the merits, the court denied the new trial motion for three reasons. First, it concluded Elizabeth's declaration did not constitute new evidence. The court reasoned that when the trial started, the defense sought to introduce evidence that Jane Doe and her sister were "somehow falsifying evidence" due to "some family disputes," so the fact that Elizabeth was now putting "in writing what had been already suggested by the defense" did not "necessarily" constitute new evidence.

Next, the court found that if the evidence was presented at a retrial, a different outcome was not "probable." The court reasoned that the People's witnesses were compelling, and the audio recording also likely had an impact. Given the fact that Jane Doe's "testimony is the key," the court concluded that whether or not Elizabeth and Janeth "had some animus and were trying to have [defendant] deported . . . would not be sufficient to overcome the People's evidence and would not likely lead to a different outcome."

Finally, the court found that this evidence could have been discovered sooner. Taking defense counsel at his word that his office had not previously known about Elizabeth's involvement, the court nevertheless believed that "if her statement were true," it would have come out sooner, given that Elizabeth had been present in court, had been identified as a potential witness, and was married to defendant.

11

## DISCUSSION

The trial court may grant a new trial motion "[w]hen new evidence is discovered material to the defendant, and which he [or she] could not, with reasonable diligence, have discovered and produced at the trial." (§ 1181, subd. (8).) "The central question in the determination of whether a new trial should be granted on the ground of 'newly discovered evidence' is whether that evidence would probably result in a different verdict upon retrial. [Citation.] That is a question which normally can best be answered by the trial judge, who has been witness to the presentation of all the evidence at trial. Consequently, the trial court's determination that a new trial should not be granted may be disturbed only where it is shown that there had been an abuse of discretion—as, for example, where the 'newly discovered evidence' contradicts the strongest evidence introduced against the defendant." (*People v. Cooper* (1979) 95 Cal.App.3d 844, 852 (*Cooper*).)

In ruling on a motion for new trial based on newly discovered evidence, courts consider the following factors: (1) whether the evidence, not just its materiality, is " ' "newly discovered" ' "; (2) whether the evidence is " ' "cumulative" ' " as to the factual issue; (3) if admitting the evidence at a retrial would " ' "render a different result probable" ' "; (4) if the moving party, with " ' "reasonable diligence," ' " could have discovered and produced the evidence at trial; and (5) whether the facts are " ' "shown by the best evidence of which the case admits." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328 (*Delgado*).)

In the present case, the trial court addressed each of these factors in denying the new trial motion. However, the court's analysis was short on facts and in some places inconsistent with the record. For example, in concluding that Elizabeth's declaration does not constitute new evidence, the

12

court emphasized that the defense theory had always been that Jane Doe was lying because of a family dispute. But the pertinent question is whether the evidence is new, not whether it supports a new theory. (See § 1181, subd. (8) [requiring "new evidence" to be material merely "to the defendant"].) The trial court did not address that Elizabeth's declaration stated, unequivocally and for the first time, that she and Janeth made up a story about defendant molesting Jane Doe and coached Jane to tell that false story to the police for the purpose of getting defendant deported. This was undeniably new evidence of different facts than those presented at trial, and the trial court took defense counsel at his word that this evidence was not known to the defense at the time of trial.

The trial court's finding that this evidence could have been discovered sooner is, for similar reasons, unsupported by the record, as it ignores Elizabeth's statement under penalty of perjury that she pretended to be on defendant's side during the court proceedings. In light of this ruse, which is consistent with defense counsel's account of what Elizabeth told them during their pretrial investigation, we fail to see how any lack of diligence on counsel's part can be blamed for not prompting Elizabeth to confess that she and her sister caused defendant to face false allegations of felony conduct.

The trial court's determination that this evidence would likely not have rendered a different result raises additional concerns. The court viewed the prosecution's evidence as compelling and dismissed Elizabeth's declaration as an expression of animus toward defendant, again failing to recognize the ways in which Elizabeth's declaration contradicts the prosecution's case and potentially undermines the credibility of both Jane Doe and Melissa. Under the trial court's view, the fact that defendant presented to the jury a defense that the witnesses were lying somehow weighs against granting him a new

13

trial, but the opposite is true. "Numerous cases hold that a motion for a new trial should be granted when the newly discovered evidence contradicts the strongest evidence introduced against the defendant." (*People v. Martinez* (1984) 36 Cal.3d 816, 823; see e.g. *People v. Gilbert* (1944) 62 Cal.App.2d 933, 938; *People v. Randle* (1982) 130 Cal.App.3d 286, 293–294.) On its face, Elizabeth's declaration contradicts the strongest evidence against defendant, the testimony of Jane Doe, as well as the ostensibly corroborating testimony of her older sister. The declaration also provides an explanation for the audio recording that is inconsistent with the prosecution's case. Moreover, defense evidence that Janeth attempted to get family members to lie about defendant was excluded at trial precisely because of the absence of evidence linking Janeth's animus to Jane Doe, and Elizabeth's testimony could potentially provide that link.

On appeal, the People discount Elizabeth's declaration as impeachment evidence, invoking the general rule that a new trial should not be granted "where the only value of the newly discovered testimony is as impeaching evidence or to contradict a witness of the opposing party." (*People v. Hall* (2010) 187 Cal.App.4th 282, 299.) In *Hall*, the defendant moved for a new trial based on newly discovered evidence offered to impeach the credibility of a medical expert who testified at the defendant's murder trial. Finding no legal basis to grant the motion, the trial court reasoned that the issue was " 'not a big part of this case' " and that the proffered evidence contradicted the defendant's own testimony. (*Id.* at p. 298.) The ruling was affirmed on multiple grounds, including that its primary value was to impeach a prosecution expert, and that the expert's testimony was "not the strongest evidence" against the defendant. (*Id.* at pp. 298–299.) By contrast, in the present case Elizabeth's declaration does contradict the strongest evidence

14

against defendant. At a retrial, Elizabeth's testimony could potentially raise grave doubts about the veracity and credibility of the only witnesses who testified against defendant, while providing an innocent explanation for the recorded statement the prosecution relied upon to corroborate their testimony. (See *People v. Huskins* (1966) 245 Cal.App.2d 859, 862–863.)

To its credit, the trial court found that Elizabeth's declaration was not cumulative, and that if she testified at a retrial, her testimony would be the best evidence of her version of events. The court acknowledged these as relevant factors. (See *Delgado, supra*, 5 Cal.4th at p. 328.) Yet it did not conduct an evidentiary hearing, taking the view that it did not need to consider Elizabeth's actual testimony to reach a fair disposition of the motion, instead "assum[ing]" any testimony from Elizabeth would be consistent with her declaration. In another case, where the proffered testimony is less damaging to the prosecution's trial evidence, such an approach might be proper. But here, testimony consistent with Elizabeth's declaration, *if at all credible*, would have required the trial court to grant defendant a new trial because it would have rendered probable a different result at trial. (See *Cooper, supra*, 95 Cal.App.3d at p. 852.) Our reading of the transcript suggests that the trial court denied the motion here because it did not, in fact, find Elizabeth's sworn declaration credible. "[I]t is difficult for the Court to believe that if her statement were true, it would not have come" to light earlier, the court explained.

Although a defendant does not have a right to an evidentiary hearing on a new trial motion, the court has authority to order one. (*People v. Hedgecock* (1990) 51 Cal.3d 395, 415, 417, 419; *People v. Hayes* (1999) 21 Cal.4th 1211, 1255.) Indeed, our Supreme Court has acknowledged the value of an evidentiary hearing when material facts are in dispute. (*Ibid.*) Here,

15

had Elizabeth been examined about her statement, the parties could have probed her account for strengths and weaknesses, which might have clarified whether the new evidence was sufficiently credible to warrant a new trial. (See *Hedgecock*, at p. 417 ["when compared to the use of affidavits, a hearing at which witnesses testify and are subject to cross-examination is a more reliable means of determining whether misconduct occurred"].)  At an evidentiary hearing, the trial court could have assessed whether Elizabeth was indeed willing to testify consistently with her declaration, and it could have observed her demeanor in evaluating whether a jury could find her credible.

The People analogize Elizabeth to a witness who gave testimony and then retracted it, positing that her declaration must be " 'viewed with suspicion.' "  (Quoting *In re Weber* (1974) 11 Cal.3d 703, 704.)  The People's analogy does not hold, as the jury heard nothing from Elizabeth; they only heard from Jane Doe and Melissa.  In any event, even when a new trial is based on a witness's recantation, the role of the trial court "is to determine whether the new evidence is credible, i.e., worthy of belief by the jury.  That determination is made after a consideration of *all the facts* pertinent to the particular issue.  The trial court is not the final arbiter of the truth or falsity of the new evidence."  (*People v. Minnick* (1989) 214 Cal.App.3d 1478, 1482, italics added.)

In the similar though not identical situation of a witness who comes forward to confess to a crime for which the defendant was convicted, it has been held that a trial court ruling on a new trial motion should take "advantage of what purport[s] to be critical new evidence" by taking "affirmative action" to call the declarant as a witness and examine him or her under oath, thus allowing the witness to be questioned fully about the

16

contents of the declaration. (*People v. Hairgrove* (1971) 18 Cal.App.3d 606, 610.) If the court had followed that course here, Elizabeth's testimony could potentially have established that there was substantial merit to the new trial motion or, alternatively, that Elizabeth had clearly perjured herself to help defendant. "Either outcome would have contributed positively to the administration of justice," and even if Elizabeth's testimony turned out to be inconclusive, "at least the court would have had all available information before it in ruling on the motion for a new trial." (*Hairgrove*, at pp. 610–611.)

Our Supreme Court has held that a ruling on a new trial motion will not be disturbed on appeal " ' "unless a manifest and unmistakable abuse of discretion clearly appears." ' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1210.) However, the Court has also recognized that such an abuse can occur where affidavits produced by the moving party constitute material evidence that the defendant may have been falsely convicted. (*People v. Williams* (1962) 57 Cal.2d 263, 275.) To be sure, *Williams* involved unique facts; unbiased affiants who came forward with new evidence that undermined the uncorroborated testimony of a single prosecution witness and provided the defendant with a complete defense. (*Id.* at pp. 270–271.) Nevertheless, in concluding that it was "an abuse of discretion for the trial court not to have granted defendant's motion for a new trial," the Court emphasized that where "affidavits . . . disclose a deliberate scheme to produce false evidence and to abuse and subvert the process of the court for the purpose of bringing about the conviction of an innocent man," courts "must be particularly sensitive to prevent such a criminal perversion of their proper functions." (*Id.* at p. 275; see also *In re Sagin* (2019) 39 Cal.App.5th 570 [vacating conviction on petition for habeas corpus in light of newly discovered DNA evidence].)

On the record presented to us, we conclude Elizabeth's declaration does constitute new evidence, and the trial court's first error was in concluding otherwise. It also failed properly to evaluate the credibility and force of this evidence. The court appears to have surmised that Elizabeth's account was not true based primarily, if not solely, on the timing of her disclosure. And the court's ultimate conclusion that granting the new trial motion would not likely change the outcome of this case was based on its determination that the two witnesses who were allowed to testify were compelling, without considering how the jury might have evaluated their testimony differently if Elizabeth's testimony also proved to be compelling in its own right and if, as a result of Elizabeth's testimony, the jury had heard from John Doe and his grandmother.

We will not attempt to assess Elizabeth's credibility based on her sworn declaration alone, and for that reason do not decide whether defendant is actually entitled to a new trial. We do, however, conclude that the trial court clearly abused its discretion in denying defendant's new trial motion without first holding an evidentiary hearing that would enable it more clearly to assess the new evidence.

## DISPOSITION

The judgment and the order denying the new trial motion are vacated, and the matter is remanded to the trial court with directions to rehear the motion for a new trial.

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.

*People v. Raphael B.D.R.* (A167246)

18

Trial Court:          Alameda County Superior Court

Trial Judge:          Hon. Delia Trevino

Counsel:              Beles & Beles, Robert J. Beles, and Micah Reyner, for
                          Defendant and Appellant

                      Rob Bonta, Attorney General of California, Lance E.
                          Winters, Chief Assistant Attorney General, Susan
                          Sullivan Pithey, Senior Assistant Attorney General,
                          Wyatt E. Bloomfield, Supervising Deputy Attorney
                          General, and Lindsay Boyd, Deputy Attorney General
                          for Plaintiff and Respondent