[Crim. No. 1035.    Fourth Dist.    Sept. 22, 1955.]

THE PEOPLE, Respondent, v. FRANK F. MAZZA, Appellant.

Pentoney & Tebbetts for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

MUSSELL, J.—Defendant was charged with having murdered one Emma Orr on August 13, 1954, in the county of San Diego. A jury returned a verdict finding him guilty of the crime charged, fixed the degree as murder in the first degree, and punishment as imprisonment in the state prison for life. His motion for a new trial was denied and he appeals from the judgment of conviction, contending (1) That the verdict is contrary to the law and evidence; and (2) That evidence was improperly received.

The evidence, viewed in the light most favorable to the prosecution (*People* v. *Spreckels,* 125 Cal.App.2d 507, 509 [270 P.2d 513]) and briefly summarized, is as follows: Mrs. Emma Orr, with her 16-year-old son, lived with her sister-in-law near the intersection of College Avenue and El Cajon Boulevard, in the city of San Diego. At about 3:10 a. m. on Friday, August 13, 1954, Mrs. Grumbles, who lives on a hill by and overlooking College Avenue, heard a lady groaning and saying several times, "Help. I have been hit. Please help. I am hurt." Mrs. Grumbles then called the police, who arrived at the vacant lot below the Grumbles house in about five minutes.

Police Officer McFadden testified that shortly after 3 a. m. on August 13, 1954, he and Officer Dawson received a radio call to go to the vicinity of College Avenue and Adelaide; that as they started down College Avenue they heard a voice calling "Help"; that they turned their car lights out onto a vacant lot and observed Mrs. Orr lying on the ground. Officer Dawson was the first out of the police car and observed Mrs. Orr lying on her back at the foot of a bank of dirt near an apartment building which was under construction. She was able to talk but she said she could not move. An ambulance was called and while they were waiting for it to arrive, Mrs. Orr told Officer Dawson that she had been to the Paris Inn, had some beer there, and then had gone to Horton Plaza to catch her bus; that a man, whom she had never seen before, driving an old car, tried to pick her up; that she ignored this man and boarded the bus which goes out to College Avenue; that when she got off the bus on College Avenue, the man was still following her; that she walked south on College Avenue along the sidewalk as far as she could; that this man would make a "U" turn at every intersection and would wait for her to cross the intersection, insisting that she get in the car; that after the sidewalk ended, she walked on the left side of the highway; that this man proceeded on down below, made a

"U" turn and came back at a fast rate of speed; that she knew he was not going to stop and she jumped off the highway onto the vacant lot; that he followed her, ran over her and shoved her into the bank; that the man was middle-aged, dark complected, and was wearing a white shirt.

Officer McFadden observed that Mrs. Orr was lying flat on her back; that she was covered with a film of dirt; that her dress was pulled up; that there was some blood on her head and a spot on her leg; that her coat was lying on the bank above her and her purse was on the ground near it. He observed two vertical indentations, about 5 feet apart and 6 inches deep in the bank directly above Mrs. Orr, and a horizontal indentation across the top of the two vertical indentations.

Officer Dawson observed that the ground had a lot of traffic over it, that it was dusty, and that from the dust left on the pavement, there appeared to be a place where a car had backed out and turned north on College Avenue.

Officers Martindale and Cota arrived at the scene within five minutes after Officers Dawson and McFadden. Officer Martindale estimated the distance of the vacant lot as approximately six blocks from College Avenue and El Cajon Boulevard. He observed abrasions on Mrs. Orr's legs and that her face was covered with fine dust, which was the same color as the dirt on the bank. He also noticed the two indentations in the bank, the approximate width of the tires of a car, and heard Mrs. Orr say that she was paralyzed from the waist down; that a car had come off the street and run over her; that it was the same car that "had tried to pick her up" downtown; that as she was walking down College Avenue, the car had gone back and forth, north and south, on College Avenue, several times; that finally while going north on College Avenue the car ran off the roadway onto the vacant lot where she was and had run over her.

Officer McFadden returned to the scene at about 6 a. m and observed a place where a car had left College Avenue and made a mark on the roadway at the edge of the pavement in a straight line toward the two indentations on the bank.

Mrs. Orr was taken to the county hospital, where her clothing was cut off and she was prepared for emergency treatment. She was covered with dirt from her waist up. There was considerable dirt in her nose and ears and on her face, as well as in her eyes.

Dr. Worthylake, who was called by the defense as a witness

at the trial, testified that he was a surgical resident at the county hospital; that he saw Mrs. Orr in the receiving room in the hospital at approximately 4 a.m. on August 13th; that Mrs. Orr had compression of the cervical segment of the spinal cord with paralysis of the lower extremities and partial paralysis of the upper extremities; that he partially shaved her skull in order to place a pair of tongs in the skull to provide traction on the cervical spine. He asked Mrs. Orr what had happened and she related to him substantially the same facts as she had related to Officers Dawson and Mc-Fadden at the scene of her injuries.

Naomi Geib, a witness called on behalf of the defendant, testified that she was an interne at the county hospital and first saw Mrs. Orr there at about 3:40 a.m. on August 13th; that she was present when part of the conversation between Dr. Worthylake and Mrs. Orr took place; that Mrs. Orr talked coherently; that they attempted to find out from her who her assailant was and that she said it was a gray car and that the man had hair about the color of the doctor's. She testified further that Mrs. Orr "kept always saying 'He turned the wheels on me,' and 'He came back after hitting her once, he came back and hit her again.'"

Mrs. Orr passed away at about 10 p.m on August 14th and an autopsy was performed by Dr. Weston, pathologist for the San Diego County coroner. Dr. Weston testified at the trial and was shown various photographs of Mrs. Orr which were taken at the time of the autopsy. He described the injuries on Mrs. Orr's body, using the photographs for reference. He noted a number of abrasions and contusions on the forehead and on the face and differentiated for the jury the cuts that appeared incident to the surgery. Among the injuries to her extremities the doctor noted bruises on her legs which he believed were formed at the same time because they were in exact apposition to each other. He stated that there was a bruise on the back of Mrs. Orr's neck and internal examination disclosed a depressed fracture in the head in the right occipital area. It measured 8 centimeters or a little under 4 inches. He testified further that internal hemorrhage was found in both the head and neck area. The second, third and fourth cervical vertebrae, which are in the area of the neck, were broken. This had resulted in pressure on the spinal cord and hemorrhage. The pressure was such as to produce paralysis. In the doctor's opinion, the cause of death was a combination of the pressure from the fracture

on the back of her head operating on the cerebellum, brain stem, in conjunction with the changes in the spinal column as a result of the fracture of the cervical vertebrae.

John Faria, a bus operator for the San Diego Transit System, was operating a bus which left Fourth Street and Broadway in downtown San Diego at approximately 2:30 a. m. on the morning of August 13th. Faria had parked his bus at about 2:05 a. m. on Fourth Street near the corner and gone into Leightons, a nearby restaurant. He saw Mrs. Orr come into the restaurant. She inquired what time the bus departed and had a cup of coffee. Faria left the restaurant at 2:15 a. m., stopped in front of his bus and smoked a cigarette. A few moments later Mrs. Orr came out and stood two or three feet from Faria. At this time an automobile was driven up in front of the bus and stopped directly opposite Faria. The automobile was a two-door, 1946 or 1947 Oldsmobile, of a "dirty" gray color. The driver then pulled up opposite Mrs. Orr and stayed in that position two or three minutes, looking at her. He said something to her and Faria heard her say "Not a chance. I don't get in that car. I would take a slow boat to China." The driver of the automobile then made a right turn on Broadway and two or three minutes later he again drove up immediately opposite Mrs. Orr and stopped for two or three minutes and then drove right on Broadway. Mrs. Orr got into the bus and when it reached the intersection of College Avenue and El Cajon, at approximately 3 a. m., she left it and started walking toward her home. Faria told her to be careful, that he thought the car had followed them. She replied that she was not worried. Faria identified appellant as the man who was driving the gray Oldsmobile and identified it as the same car he saw at Fourth and Broadway.

James Rutledge, a guard at a department store in San Diego, testified that about 2:15 a. m. on August 13th he observed a woman walking south on Broadway in a crosswalk; that an automobile stopped in the center of Broadway in the crosswalk, blocking the passage of the woman. She was at the driver's window and he observed that the driver was talking to her. The woman walked around the rear of the car and the driver then drove east on Broadway. The automobile was an old model, of a "dirty" gray color.

Mrs. Pearl Hodge testified that she left the restaurant where she was working at Fourth and "C" Streets in San Diego at 2:30 a. m. on August 13, 1954. She proceeded toward

her home, walking down the north side of "C" Street. After she crossed Third Street, an automobile drove around the corner and along beside her. The driver kept asking her to get in the car, telling her that he would take her home. Mrs. Hodge ignored him and as she was walking toward Second Street, the car went around the corner to the right. When she reached the corner, the same man was there, this time on foot. As she passed him he said "Oh, it is nice." Mrs. Hodge told him to "Drop dead" and kept on walking. The man then used profane language toward her. The man's complexion was rather dark. He had dark hair, which appeared to be curly. The automobile appeared to be a dark gray and an old model. Mrs. Hodge identified the man as appellant and also identified his automobile as the car he was driving at the time.

Appellant was arrested on the morning of August 15, 1954, at his home in the 4900 block in West Point Loma in San Diego. The arresting officers examined his car but found nothing of significance. They questioned appellant at the police station and he stated he had parked his car, on August 12th at about 3 p.m., on Fifth Street, near a card room in San Diego; that he played cards from then until midnight; that after the game he walked around downtown for a short time and had a cup of coffee; that he arrived home at 2:30 a.m. One of the officers reminded him that he had previously stated that he had arrived home between 1 and 1:15 a.m. and appellant said he had made a mistake about the time, that it was 2:30 a.m. Appellant was asked if he had tried to "pick up" any women in the downtown area. He stated he had a fine wife and two daughters and that he did not go around trying to "pick up" strange women. When asked if he was sure that at no time he had attempted to "pick up" women, appellant stated that he never did, that he was not that kind of a fellow. The officer then advised appellant that several instances when he had attempted to "pick up" women had been reported to them and appellant then stated that on several occasions he had tried to be courteous and neighborly and offer a ride to someone who might happen to be walking along the street or waiting at a bus stop; that he never became angry if the person did not want to ride with him. He stated that he never followed a bus, nor a woman on a bus, to her home in San Diego or anywhere else.

Police Officer R. L. Creason testified that he assisted in the transportation of appellant to the municipal court for

his arraignment on August 17, 1954; that he, Creason, obtained a copy of the complaint from the clerk and handed it to appellant, who was sitting in the jury box; that after reading the complaint, appellant asked what the numbers 187 P. C. stood for on the face of the complaint. Creason told appellant that this was the section of the Penal Code pertaining to the charge of murder. Appellant then ''Jumped back in his seat rather sharply and said, 'Murder, never. Manslaughter, yea, but murder, never. I would never hurt anyone intentionally.' ''

Ray H. Pinker, a forensic chemist, testified that he examined appellant's automobile on November 3, 1954; that he found nothing of significance in the way of physical evidence; that the heavy coat of oil and grease on the underneath surface of the car had not been disturbed and that he found no significant foreign adhering material; that he noticed some minor scarring or abrasive marks on the bumper and some old damage to one of the fenders; that as a result of his examination he could not say whether the car had collided with Mrs. Orr; that in his opinion the absence of physical evidence did not eliminate the car as the one which struck Emma Orr.

Evidence was introduced by the prosecution of a number of instances in which appellant had attempted to get women to ride with him in his car.

A Mrs. Mahoney testified that at 11 p. m on August 12th appellant followed her in his car.

Mrs. Mary Jo Strattman saw a man, whom she identified as the appellant, at 12:30 p. m., August 7, 1954. She was then walking south on Twelfth Street in San Diego when appellant grabbed her by the arm and jerked her around and said ''Hi, honey'' and asked her if she remembered him. Mrs. Strattman turned around and said she did not know him. She told him that if he knew what was good for him, he would go on about his business and leave her alone. She jerked away from him and proceeded to a restaurant and as she opened the door, she heard a horn, turned around and saw appellant in his automobile waving at her to come and get in his car. The car was of a ''dirty'' gray color. On August 11, at about 4:10 p. m. Mrs. Strattman was standing on the corner of Thirteenth and Market Streets in San Diego when appellant waved at her to come over to his car. As she began to move away appellant pulled up next to her and proceeded to address her as he had on the previous

occasion. Mrs. Strattman wrote down the license number of appellant's car and reported it to the police.

Mrs. Mary Talasnik saw appellant at about 8:40 p.m., August 9, 1954. He drove up near her car and asked her if she wanted to have a drink with him and have some fun. She walked away and appellant followed her in his car, asking her to have a drink with him, saying they would have some fun and that he would show her a good time. Mrs. Talasnik then went into the public library and when she came out a few minutes later, defendant again accosted her and said "Who the Hell do you think you are that you think you are too good to go out with me?" Mrs. Talasnik kept on walking and appellant drove around the corner again and up beside her. She got in her car and appellant came up behind her. She told him she was not getting into the car and appellant acted as if he was very angry.

Mrs. Cassie Ryall saw appellant around July 31, 1954, near the Plaza, at about 11:30 p.m. He walked past her two or three times. She told him he had followed her enough and to get away or she would "give him a kick all the way up Broadway." Appellant got in his car, drove around two or three times and stopped and stared at her. She then boarded a bus and as it passed the cemetery on Market Street, she saw appellant driving through. He turned off the lights on his car and pulled in behind the bus. He followed the bus through about four bus stops and the bus driver pulled over to let him pass. However, when the bus stopped and Mrs. Ryall got off, appellant's car was directly behind the bus. The driver took the license number and walked home with Mrs. Ryall.

Appellant did not testify at the trial and his principal defense was that he played cards on the night of August 12th and arrived home at approximately 2:30 a.m. on the morning of August 13, 1954. Mrs. Mazza, his wife, testified that appellant left their home at about 11:30 a.m. on August 12th; that he had not returned by evening and she sat up waiting for him; that she looked at the clock frequently; that she noted it was 2:30 a.m. and that soon thereafter appellant returned home; that she remonstrated with him for coming in so late and finally their daughter, Gala, came into the room and said it was ten minutes to three and that their other daughter, Carol, came into the room and referred to the late hour. Mrs. Mazza stated that the family was at the beach on August 8, 1954, in the afternoon and went to the

Jai Alai games that evening; that appellant had developed a severe sunburn on his legs and was at home on Monday, August 9th; that he was at home August 10th except that he might have been out part of that morning; that she and the girls went to the beach in their car that afternoon, leaving appellant, who was still suffering from sunburn, at home; that appellant was there on their return and that he was also at home on Wednesday, August 11th while the rest of the family went to the beach and that he was out that evening for ten or fifteen minutes. Mrs. Mazza admitted telling the officers that defendant had arrived home around 1 a. m. on August 13th and she further said that he wanted to protect the appellant.

Appellant's eldest daughter, Gala, testified that she awoke about 1 a. m., August 13th, and saw her father come in at 10 minutes to 3.

These and other witnesses who testified as to the time defendant arrived at his home on August 13th merely created a conflict in the evidence and it was a question of fact for the jury to decide whether the defendant was in fact driving his car at the times and places testified to by the witnesses for the prosecution.

■ Appellant first argues that the verdict of the jury is contrary to the law and evidence. The test on appeal is whether there is substantial evidence to support the conclusions of the trier of fact. It is not whether guilt is established beyond a reasonable doubt. ■ It is also the rule on appeal that the court will not attempt to determine the weight of the evidence, but will decide only upon the face of the evidence whether it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt. ■ It is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground of insufficiency of the evidence, it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. ■ We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict. (*People* v. *Daugherty*, 40 Cal.2d 876, 885 [256 P.2d 911].)

In *People* v. *Peete,* 54 Cal.App. 333, 342 [202 P. 51], it is said:

"It is the general, if not universal, rule that where, as here, the evidence is entirely circumstantial, and no claim of any mitigating circumstances, justification, or excuse for the killing is advanced by the accused, the jury, from the nature of the wound inflicted, from the character of the weapon which the nature of the wound indicates was used, from the acts and conduct of the accused, and all the attendant and surrounding facts, may infer that the deceased was unlawfully killed by the accused, with malice aforethought, as the result of a deliberate and premeditated purpose to kill, and, so inferring, the jury, under such circumstances, may be warranted in returning a verdict of murder in the first degree."

In *People* v. *Werner,* 111 Cal.App.2d 264, 271 [244 P.2d 476], this court held that the weight of the evidence is for the trial court and in order to upset a verdict of first degree murder it must clearly appear that upon no hypothesis is there sufficient evidence to support the conclusion reached by the trier of facts; that it is not within the province of an appellate court to determine conflicts in the evidence or to choose between different inferences which may be reasonably drawn therefrom; that no rule can be laid down as to the character or the amount of proof necessary to show deliberation and premeditation, and each case must depend upon its own facts; and that the required deliberation and premeditation need not be directly shown by the evidence but may be inferred from facts and circumstances which furnish a reasonable foundation for such a conclusion.

In the instant case the jury could and apparently did reasonably infer from the evidence that appellant was driving his car in the vicinity of Fourth and Broadway in San Diego at approximately 2:30 a. m. on August 13, 1954; that after having tried repeatedly to "pick up" Mrs. Hodge, he became angry and used profane language toward her; that he saw Mrs. Orr near the bus stop at the Plaza and twice tried to "pick her up"; that he followed the bus which Mrs. Orr had boarded for several blocks, determined to get her into his car when the bus stopped; that when she alighted from the bus, he followed her down College Avenue, drove ahead and made a "U" turn at every intersection, waiting for her, and tried to get her into his car in spite of her repeated refusals; that as she scrambled into the vacant lot to avoid being hit by appellant's car, he deliberately turned his car

around in the street, and drove straight at Mrs. Orr; that he struck her with his car not only once, but twice, and in doing so, drove his car to the top of the bank, at the foot of which she was found with a broken neck. Under these circumstances, the verdict of the jury was supported by substantial evidence.

Appellant argues that the People failed to establish the guilt of the defendant beyond a reasonable doubt. However, that is not the test. (*People* v. *Daugherty*, 40 Cal.2d 876, 885, *supra*.) He also argues there were inconsistencies in the description of the man who accosted Mrs. Orr; that hearsay statements of Mrs. Orr were improperly admitted in evidence and that there was an absence of physical evidence of appellant's automobile with respect to striking a pedestrian. These arguments are without merit. ■ In *People* v. *Shaheen*, 120 Cal.App.2d 629, 637 [261 P.2d 752], this court said:

"In order to sustain a conviction it is not necessary that the identification of the defendant as the perpetrator of the crime be positive or in a manner free from inconsistencies. It is the function of the jury to pass upon the strength or weakness of the identification and the uncertainties of the witnesses in giving their testimony. Unless the evidence of identity is so weak as to constitute no evidence at all, this court cannot set aside the decision of the trial court."

■ Mrs. Orr's statements to the police at the scene of her injuries were admissible as a part of the res gestae. (*People* v. *Costa*, 40 Cal.2d 160, 168 [252 P.2d 1].) Furthermore, appellant introduced evidence of these statements as a part of his defense and no prejudicial error appears in this connection.

Ray Pinker, a forensic chemist, testified that the absence of physical evidence on appellant's car did not eliminate the car as the one which struck Mrs. Orr. This was only one of the many circumstances to be considered by the jury.

Appellant contends that the court erred in admitting evidence of other encounters of appellant with several women. We find no reversible error in this contention. ■ The general rule is that evidence of similar acts with other persons is ordinarily inadmissible. However, there is a well recognized exception to the rule when the evidence is relevant and is otherwise admissible. (*People* v. *Evans*, 113 Cal.App.2d 124, 126 [247 P.2d 915].) Evidence of other facts may be

admitted to show a general pattern, scheme, design and plan and are sufficiently similar and possess a sufficiently high degree of common features with the act charged to warrant the inference that if the defendant committed the other acts, he committed the act charged. (*People* v. *Grimes,* 113 Cal.App. 2d 365, 371 [248 P.2d 130].) Such evidence is also relevant and admissible on the question of identity. █ In the instant case the question of the identity of appellant as the man who tried to "pick up" Mrs. Orr at the time she boarded the bus was relevant to the issues and the questioned evidence was properly admitted for that purpose. The trial judge properly instructed the jury as to the limited purpose for which such evidence could be considered.

Appellant further contends that certain photographic exhibits were prejudicial and inflammatory and should not have been admitted in evidence. This argument is likewise without merit. One of the photographs to which objection is made was taken at the time the police officers found Mrs. Orr and was obviously relevant to aid the jury in determining the circumstances under which she received the injuries which resulted in her death. The remaining photographs were taken at the time the autopsy was performed and were properly used by the doctor to illustrate and show the extent and character of the injuries to Mrs. Orr. In *People* v. *Gomez,* 209 Cal. 296, 300 [286 P. 998], no error was found in the introduction into evidence of photographs of the deceased showing incision marks made for the purpose of the autopsy. █ In *People* v. *Cavanaugh,* 44 Cal.2d 252, 267 [282 P.2d 53], the court said:

"Generally, 'except in rare cases of abuse, demonstrative evidence that tends to prove a material issue or clarify the circumstances of the crime is admissible despite its prejudicial tendency.' (*People* v. *Adamson* (1946), 27 Cal.2d 478, 486 [165 P.2d 3].) This rule is another application of the principle, applied in the case of evidence of other crimes, that relevant evidence is not necessarily inadmissible because of its tendency to prejudice the jury. The admission of gruesome and horrifying photographs and objects, over objection, has been repeatedly upheld by this court under the circumstances of the particular case."

The question of whether these photographs were properly admitted into evidence was addressed to the discretion of

the trial court in the first instance and we find no prejudicial error or abuse of that discretion in this connection.

The judgment is affirmed.

Griffin, Acting P. J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 19, 1955.