[Crim. No. 5555.   Second Dist., Div. Three.   May 28, 1956.]

THE PEOPLE, Respondent, v. CHARLES CAHAN, Appellant.

Albert Jack Chotiner and Russell E. Parsons for Appellant.

Edmund G. Brown, Attorney General, William E. James and Norman H. Sokolow, Deputy Attorneys General, for Respondent.

VALLÉE, J.—Defendant was charged in two counts of an information with robbery. He was convicted by a jury as charged in both counts. He appeals from the judgment and from the order denying his motion for a new trial.

On December 15, 1954, Lee Cobert was living in an apartment at 1455 North Hayworth, Los Angeles. The apartment consisted of one room, a bathroom, and a small bar. Sam London was living with Cobert and had been for about two months. Before December 15 London had been betting on horse races, but not at a track. He would call "Scottie" and make a bet and, so far as he knew, Scottie would place the bet with a bookmaker. On December 15 London owed Scottie and, through him, the bookmaker, about $1,200 which had accumulated over a period of two weeks. Scottie asked

him for the money; he told Scottie when he got the money he would pay. Scottie never mentioned the name of the bookmaker.

On the night of December 15, 1954, London and Cobert retired close to midnight. About 1 a. m. on December 16, London was awakened by a knock on the door. He asked who was there. A voice said it was "Tony," to open the door or they would come through it. He did so and saw two men. He testified he believed one of them was defendant. He also testified he may have seen defendant prior to that time, he had heard him referred to as "Chuck" on a prior occasion. Defendant and the other person, who was unknown to London, entered the apartment. Cobert was still in bed but awake. The unknown person asked which one was London and the latter identified himself. That person said London owed $1,200 for a bookmaking debt and they had come to collect it. London said he did not have that kind of money at that time. On the headboard of Cobert's bed there was a wallet with $450 in it and a money clip with $50 or $60 in it. The unknown man removed the money from the wallet and clip and placed it in his pocket. Defendant asked whether London had any money. London said all he had was about $2.00 which he took from his pocket and handed to defendant. London's watch, valued at about $150, was lying on the headboard of his bed. Defendant saw the watch and said he would take it. London asked him not to, saying it was a gift from a relative. Defendant said that when the balance of the money was paid the watch would be returned, and he took London's watch. The unknown man said they would be back Saturday for the rest of the money. London and Cobert were in fear and the property of each was taken against his will. (Pen. Code, § 211.) Defendant and the unknown person were in the apartment not more than 10 minutes.

Wooters, Phelps, and Horrell, members of the Los Angeles Police Department, went to the apartment about 5 p. m. on December 16; they identified themselves and Cobert invited them in. Wooters asked Cobert if he might put a recorder on Cobert's telephone. Cobert gave his permission. The officers installed an induction coil on the receiver of the telephone and ran wires to a recording device which was plugged into an electrical outlet in the wall. The device was placed on a couch. London called the apartment on the telephone and

Wooters talked to him. London then went to the apartment, saw the recording device, and gave the officers permission to operate it. About an hour after Wooters arrived there was a telephone call and Cobert answered. When Cobert concluded his conversation Wooters suggested to London that the latter take the telephone and ask the party for his watch. Wooters said he would listen in. London took the telephone and talked into it. He held the earpiece at an angle from his ear with only the lower part touching his ear. Wooters stood at London's side with his head close to London's ear. London made no objection to Wooters' listening in on the telephone conversation and he had no objection to Wooters' doing so. London said to the party at the other end that he would like to get his watch back. The party replied that he would get it back ''on Saturday when the matter is taken care of.'' London stated the watch was a gift from a relative and he would like very much to have it returned. The party assured him he would get it back on Saturday ''when the balance was taken care of.''

Wooters testified he had known defendant about 3 years. When the call came into the apartment Cobert answered the telephone and talked for a short period, then London took the phone. He listened to the conversation. He had London's permission to do so. He recognized the voice on the other end as defendant's. London said, ''Hey, Chuck, when am I going to get that watch back?'' Defendant said, ''You will get the watch back when you come up with the money. I will see you Saturday.'' Defendant is known throughout the city as Chuck.

The watch was returned to London the morning of Saturday, July 16, 1955 (the trial commenced July 21, 1955). London heard a knock on the door of the apartment and answered. A person he had never seen before handed him a package, stating it was a present for London. The person left immediately. The package contained London's watch.

The defense was an alibi. Defendant and Harold Coates testified they were together the night of December 15 and the early morning of December 16, that they left the Dutch Oven restaurant at Beverly and Vermont about 12:30 a. m. and arrived at the Candle Light restaurant and bar at Sunset and Laurel Canyon Boulevard about 1 a. m., remaining there until about 2:15 a. m. The manager of the Candle Light testified defendant and Coates arrived at the restaurant shortly before 1 a. m., December 16, and left a little after 2 a. m. The

Candle Light was a quarter of a mile from the apartment house on Hayworth. Wooters testified he walked the distance in two and one-half minutes.

Defendant first contends the evidence is insufficient to support the verdicts. He attacks the credibility of London, asserts the evidence is woefully weak and neither clear nor good, challenges London's identification of defendant, and argues the convincing force of the alibi. ■ It is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which a determination depends. ■ A reviewing court cannot reject the testimony of a witness that has been believed by the trier of fact unless there exists either a physical impossibility that it is true or its falsity is apparent without resorting to inferences or deductions. ■ Even testimony which is subject to justifiable suspicion does not justify the reversal of a judgment. (*People* v. *White*, 43 Cal.2d 740, 747 [278 P.2d 9].) ■ A reviewing court will not hold unsupported a jury's finding of guilt merely because it might reasonably draw different inferences from those the jury reasonably drew or might not be convinced beyond a reasonable doubt of the guilt of the defendant. (*People* v. *Whitehurst*, 112 Cal.App.2d 140, 143 [245 P.2d 509].)

Defendant says London's identification of defendant is no evidence of identification because when asked if he recognized the men who entered the apartment on the morning of December 16 he said, "I believe the defendant is one of the individuals." ■ When a witness says "I believe" he is not necessarily guessing. (*People* v. *Miller*, 134 Cal.App. 2d 792, 794 [286 P.2d 415].) ■ To sustain a conviction, it is not necessary that identification of the defendant be positive and free of inconsistencies. (*People* v. *Mazza*, 135 Cal.App.2d 587, 598 [287 P.2d 798].) ■ "If the testimony of the identifying witnesses is worthy of credence and convinces the jury, the latter's finding is final unless the trial judge should with his intimate knowledge of the witness' behavior upset the verdict. [Citations.] It is not essential that the witness be free from doubt as to one's identity. He may testify that in his belief, opinion or judgment the accused is the person who perpetrated the crime. The want of positiveness goes only to the weight of the testimony." (*People* v. *Harris*, 87 Cal. App.2d 818, 823 [198 P.2d 60].) ■ Even though the alibi testimony sounds plausible on the cold record, it does not

justify a reversal. The jury was not compelled to believe the testimony of defendant and the alibi witnesses. (*People* v. *Shivers*, 139 Cal.App.2d 275, 277 [293 P.2d 479]; *People* v. *Quijada*, 124 Cal.App.2d 422, 425 [268 P.2d 745].) The verdicts are supported by substantial evidence.

Defendant made a motion to dismiss the information under Penal Code, section 995. The motion was denied. He contended, and now contends, he was not legally committed by a magistrate. The person who acted as committing magistrate had been a judge of the Municipal Court, Los Angeles Judicial District. On January 1, 1947, this judge was permitted to retire under the Judges' Retirement Act because of physical disability. (2 Deering's Gen. Laws, Act 5849a, § 3.) The substance of the physician's affidavit filed with the certificate of retirement in the office of the secretary of state is stated in the margin.[1] An affidavit of one of counsel for defendant filed in support of the motion stated that on inquiry at the Employees Retirement Board he stated on information and belief that the record failed to show the judge had ever been relieved from such disability. Prior to the preliminary examination in this case the Chairman of the Judicial Council, with the consent of the judge, assigned the retired judge to sit in the Municipal Court, Los Angeles Judicial District, from December 7, 1954, to March 4, 1955. The preliminary examination was held on January 24, 1955.

The judge retired under section 3 of the Judges' Retirement Act.[2] At the time of retirement the act provided that any retired judge might, with his own consent and on stipulation of all counsel in the case or cases to which he was assigned to sit, be assigned by the Chairman of the Judicial Council to sit in any court; and while so assigned he had all the powers of a judge thereof. (See Deering's Gen. Laws,

---

[1]The judge "is incapacitated for judicial work due to the results of a small cerebral thrombosis which was a complication of a long standing generalized arteriosclerosis and an arteriosclerotic hypertensive disease: this cerebral thrombosis has resulted in persistent and bothersome tinnitus, a state of over-emotionalism with some loss of memory and mental acuity. There is also an associated early hypertensive arteriosclerotic heart disease, which at the present time is compensated and asymptomatic. Therefore, it is my opinion, based on the above mentioned examination and medical care over a thirty month period, that the said Judge . . . is unable to efficiently discharge the duties of [the office] by reason of the physical disabilities noted above and that such disabilities are, and at all times in the future likely to be, of a permanent character."

[2]Now Gov. Code, § 75060.

Act 5849a, § 6.) In 1951 the statute was amended to read:

"Judges retired pursuant to this act, so long as they are entitled by its provisions to receive a retirement allowance, shall be judicial officers of the State, but shall not exercise any of the powers of a justice or judge except while under assignment to a court as provided in this section.

"Any such retired judge may, with his own consent, be assigned by the Chairman of the Judicial Council to sit in a court of like jurisdiction as, or higher jurisdiction than, that court from which he was retired; and while so assigned shall have all the powers of a justice or judge thereof." (Gov. Code, § 75081.) It will be noted that the requirement of a stipulation of counsel was omitted.

The point made is that section 75081 is unconstitutional, that the retired judge was without power to sit because there was no showing the disability ever terminated, that in the absence of such showing it must be presumed the disability continues and consequently the commitment was void. Counsel do not point out wherein the statute is unconstitutional. Its constitutionality was settled by *Pickens* v. *Johnson,* 42 Cal.2d 399, 405 et seq. [267 P.2d 801]. When a retired judge is duly assigned to a municipal court under the retirement act he is a regular judge of that court. (*Id.,* 409.) In Pickens it is said that "it must be assumed that an assigned retired superior court judge is possessed of all of the qualifications otherwise acquired [required] for service on that court." The same applies to an assigned, retired municipal court judge. It appears from the records of the Judicial Council, of which we take judicial notice (Code Civ. Proc., § 1875, subds. 3, 5), that the retired judge had previously been assigned to the same court by the Chairman of the Judicial Council from April 1, 1952, to December 31, 1952, and from January 13, 1953, to July 31, 1953. We must assume in the absence of a contrary showing that at the time the judge in question was assigned recovery had been made from any disability preventing service as a judge. Further it must be presumed that a person acting in a public office was regularly appointed and that the Chairman of the Judicial Council, in performing his official duty in making the assignment, regularly performed that duty and determined that recovery had been made. (Code Civ. Proc., § 1963, subds. 14, 15.) Defendant was regularly committed by a magistrate.

Cobert testified at defendant's preliminary examination. The testimony was taken down in the presence of defendant, and he was cross-examined by defendant's counsel. He was absent at the trial and over defendant's objection the court permitted his testimony taken at the preliminary to be read. (Pen. Code, § 686.) Defendant claims a sufficient foundation was not laid for reading the testimony. On March 16, 1955, the cause was set for trial for April 27, 1955. On April 22, 1955, it was continued to June 8, 1955. On June 8 it was continued to July 19, 1955. On July 19 it was continued to July 20, and on July 20 to July 21, 1955, when the trial began.

It was shown that at the preliminary Cobert testified he then resided at 1306 Melville Street, Las Vegas, Nevada. On April 25, 1955, the chief of the record division of the Los Angeles district attorney's office wrote and mailed a letter to Cobert at Las Vegas. The letter was returned to her in an envelope postmarked "Las Vegas, Nevada, May 10, 1955." On the reverse side of the letter which was sent there was writing to the effect that he was unable to be in Los Angeles, with the signature "L. Cobert" at the bottom thereof. On June 29, 1955, the chief of the record division wrote and mailed another letter to Cobert at Las Vegas. The letter said, "Your reply should bear your personal signature." That letter was returned to her in an envelope postmarked "Las Vegas, Nevada, July 6, 1955." On the reverse side of that letter there was writing stating he was unable to be in California, followed by the signature "L. S. Cobert." On July 19, 1955, the district attorney of Los Angeles County sent a telegram to Cobert at Las Vegas. The telegram was delivered. The district attorney received an answering telegram from Las Vegas dated July 19, 1955, sent collect, with "L S Cobert" appearing as the sender, stating he would be unable to attend the trial. Subpoenas were issued for Cobert by the district attorney on March 23 and April 22, 1955. There were notations thereon that he was in Las Vegas.

The statute says the testimony of a witness taken before the committing magistrate may be read at the trial on its being satisfactorily shown to the court that he cannot, with due diligence, be found within the state. (Pen. Code, § 686.) A finding of a trial court that sufficient showing has been made will not be disturbed on review unless its discretion has been abused—that is, unless it appears the evidence

is insufficient to support the finding. (*People* v. *Mueller*, 168 Cal. 526, 529 [143 P. 750] ; 14 Cal.Jur.2d 371, § 140; 19 Cal. Jur.2d 222, § 460.)    We think it patent that due diligence was shown and that it conclusively appeared Cobert could not be found within the state. In fact, he was satisfactorily shown to be beyond the jurisdiction of the court.

At the time the court ruled on the admission of Cobert's testimony, defendant requested a continuance for the asserted purpose of taking Cobert's deposition under the Uniform Act to Secure the Attendance of Witnesses from without the State in Criminal Cases. (Pen. Code, §§ 1334-1334.6.) The request was denied. Defendant claims error. Counsel for defendant at the trial represented him at the preliminary. If they had any ground for taking his deposition they had ample opportunity to interview him and to take it prior to the trial. They told the court they had learned only a day before the request was made that Cobert would testify he did not give the officers permission to install the recording device, and he had not been questioned on the subject at the preliminary, which latter was a fact. No affidavit was filed. No showing was made as to how the information was obtained or why counsel had not obtained it previously. They had listened to the recording prior to the trial. The recording was not admitted in evidence. Whether Cobert did or did not give the officers permission to install the recording device was of no particular consequence. The court did not abuse its discretion in denying a continuance.

Over defendant's objection Wooters was permitted to testify to what he heard of the telephone conversation between London and defendant. Defendant claims the court erred in the ruling. It is argued that admission of the testimony violated Penal Code, section 640;[3] that it violated section 605 of the Federal Communications Act;[4] that it violated Public Utilities Code, section 7903;[5] and that it was in effect an unlawful search and seizure and amounted to a denial

[3] Proscribing the making of an unauthorized connection with a telephone wire or instrument, or the unauthorized learning of the contents of any communication passing over any telephone wire, or the communication of any information so obtained.

[4] 47 U.S.C.A., § 605, proscribing the interception by any person not the sender of any communication and the divulging of the contents thereof.

[5] Successor to Penal Code, § 639, proscribing certain conduct on the part of employees of a telephone company.

of due process of law. The point is without merit. Both London and Wooters testified to the substance of the conversation. Wooters testified he had London's permission to listen. London testified that Wooters suggested to him that he take the telephone and ask the party for his watch; Wooters said he would listen in; accordingly he took the telephone from Cobert and talked into it; he made no objection to Wooters' listening in, nor did he have any objection to his doing so.

The point was settled in *People* v. *Malotte,* 46 Cal.2d 59 [292 P.2d 517]. In Malotte two police officers registered in a hotel room, installed a device designed to overhear a telephone conversation without the necessity of making physical connection with the telephone electrical circuit, and connected it to an induction coil. One of the officers placed a call to a certain number and the defendant answered. The conversation was recorded and the recording was admitted in evidence. The court held the evidence was not obtained in violation of Penal Code, section 640, or in violation of section 605 of the Federal Communications Act; and that overhearing the telephone conversation was not a search or seizure within the meaning of the federal or state Constitution, and that no constitutional rights of the defendant were violated. Public Utilities Code, section 7903, is not relevant. Instructions with respect to section 605 of the Federal Communications Act proffered by defendant were inapplicable to the facts and were properly refused.

Defendant's next specification of error is that the jury was guilty of misconduct. In support of his motion for a new trial defendant filed two affidavits: one by defense counsel told of photographs taken of defendant outside the courtroom prior to the beginning of the trial and published in Los Angeles newspapers during the course of the trial, of newspaper publicity surrounding the trial, and the employment of an investigator to interview the jurors after the trial; the other by the investigator related to an interview he had with one juror and stated what the juror had said to him. The attempt was to impeach the verdicts through the use of hearsay statements as to what occurred during the period the jury was deliberating and speculation on the effect of certain newspaper publicity. The verdict of a jury cannot be impeached by affidavits of third persons which merely set forth the substance of extrajudicial statements

made by the jurors. (*People* v. *Giminiani*, 45 Cal.App.2d 535, 540 [114 P.2d 392].) ■ A juror cannot impeach his own verdict except in the single case of a verdict arrived at by chance or lot. (*People* v. *Zelver*, 135 Cal.App.2d 226, 235-236 [287 P.2d 183].)

■ Defendant complains of four rulings of the court. On cross-examination of Wooters, counsel for defendant sought to read to him a part of the decision of the Supreme Court in *People* v. *Cahan* (this defendant), 44 Cal.2d 434 [282 P.2d 905], and to ask him whether he had read it, and to show thereby that he was biased and prejudiced against defendant. The questions were not actually asked. Counsel stated his purpose to the court, the People objected, and the objection was sustained. The ruling was obviously correct. The witness could not be shown to be biased or prejudiced by what the Supreme Court said in the previous Cahan case. Defendant was not restricted in his effort to show that Wooters was biased.

On direct examination defendant testified he did not commit the offenses charged, did not know London or Scottie, and London did not owe him any money. On cross the following occurred: ''By Mr. CARR [Deputy District Attorney]: Q. Mr. Cahan, what is your occupation? A. I buy and sell used automobiles, and occasionally make wagers on the outcome of sporting events. Q. Do you take wagers as a business on the outcome of sporting events? A. I make wagers. Q. The question was, do you take wagers on the outcome of sporting events? A. No, sir. Q. Has that ever been your occupation? Mr. PARSONS [attorney for defendant]: To which we object as immaterial, not proper cross-examination, whether it has ever been. THE COURT: Sustained. Q. BY MR. CARR: Well, Mr. Cahan, as a matter of fact, around in the month of December and the month of November, 1954, your principal occupation was that of operating a handbook, isn't that right—— MR. PARSONS: To which I object—— MR. CARR: ——on the outcome of sporting events? MR. PARSONS: To which I object as not proper cross examination. THE COURT: Overruled. THE WITNESS: No, sir. Q. BY MR. CARR: You were a bookmaker then, weren't you? MR. PARSONS: To which I object as not proper cross examination, not within the scope of the direct. THE COURT: Overruled. THE WITNESS: No, sir. Q. BY MR. CARR: You know what I mean by a bookmaker? A. Yes, sir. Q. Now, isn't it a fact

in connection with bookmaking activities that you had an individual by the name of Tillie, either true name or nickname, acting as your agent? MR. PARSONS: To which I object as not within the scope of the direct examination, improper cross examination, and immaterial. THE COURT: Overruled. THE WITNESS: No, sir." Defendant claims the rulings were erroneous. We think not. ▇▇ Since defendant testified he did not commit the offenses "the permissible scope of cross-examination is very wide." (*People* v. *Tarantino*, 45 Cal. 2d 590, 599 [290 P.2d 505].) The cross-examination was directed to matters implicit in defendant's denials. The prosecution was based on the theory that defendant was the bookmaker with whom Scottie placed the London bets; that he was the one who suffered the $1,200 loss; and that that was why he went to London's apartment. The rulings were not erroneous.

▇▇ On cross-examination, after defendant had testified he had known Wooters for a couple of years and had talked to him two or three times, he was asked: "And you have heard recordings of your voice in the presence of Mr. Wooters, too, haven't you?" Counsel for defendant objected and the objection was overruled. The answer was "yes." Defendant assigns error. The ruling was proper.

▇▇ In rebuttal, in answer to questions of the district attorney, Wooters testified he had known defendant about 3 years and that he knew defendant's business or occupation during that time. He was then asked what it was, to which defendant objected. Some discussion was had and the district attorney made the statement set out in the margin.[6] The defendant assigned the statement as misconduct and asked the court to instruct the jury to disregard it. The court immediately instructed the jury to disregard everything said by both counsel. Defendant claims the statement was prejudicial. We cannot assume the jury disregarded the court's instructions.

We find no error in the record.

[6] "Your Honor, there is a connection between them when we consider the testimony of Mr. London to the effect that there was a gambling obligation of approximately $1,200.00 which he owed, and the inferences that followed that in connection with this particular case. We submit that we have a right to go into that question. If it is to be believed that—and the only testimony is that he is in the automobile business—there is no connection between this offense or the gambling obligation and the automobile business. It [sic] it is otherwise, I think we have a right to go into it."

The judgment and the order denying a new trial are affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 27, 1956.