318 P.2d 667

The STATE of Arizona, Appellee,

v.

Jesse James DUTTON, Appellant.

No. 1102.

Supreme Court of Arizona.

Nov. 26, 1957.

Lawrence Ollason, Tucson, for appellant.

Robert Morrison, Atty. Gen., Raul H. Castro, County Atty., and Jack I. Podret, Deputy County Atty. of Pima County, Tucson, for appellee.

UDALL, Chief Justice.

Jesse James Dutton, defendant-appellant, was informed against, tried and convicted by a jury of the crime of robbery, a felony (A.R.S. § 13–641). The court rendered judgment of conviction against defendant and imposed an indeterminate sentence of not less than 10 nor more than 18 years in the state penitentiary. This appeal followed. At the trial defendant was represented

by an attorney other than the one who, by court appointment, now represents him on this appeal.

At the close of the case defense counsel moved for an instructed verdict upon the general grounds that the State had failed to prove the necessary elements of the crime of robbery. A denial of this motion is the basic error assigned on this appeal. Specifically the defendant contends that the evidence did not sufficiently identify him as the perpetrator of the crime so as to warrant the court submitting the question of his guilt to a jury.

At the trial defendant elected, as was his right, not to take the witness stand and other than a few additional questions directed to the man allegedly robbed no other witnesses were called to testify in his behalf, hence there is no particular conflict in the evidence.

The evidence tending to identify defendant as the robber is as follows: Richard Gorby, a teacher in the Tucson public school system, who had part-time employment at the Desert Beverages store in Tucson, testified that at about 10:45 p. m. on July 31, 1956, two men, one described as being tall and the other short, entered the store where he was the sole attendant. The tall man asked for a bottle of packaged liquor on display and, as the witness came from behind the counter, the tall man pulled a gun and commanded that he lie on the floor; immediately thereafter he was told to get up and open the cash register which he did—then he resumed a position on the floor where the short man tied him up. The intruders then rifled the cash register and fled.

The following excerpts from Gorby's testimony will disclose the manner and extent of his identification of defendant, viz.:

"Q. Mr. Gorby, I ask you to look at the man seated at the table directly behind me, with the blue coat and blue striped shirt upon him, and I ask you if that is the man that you called the tall man? A. Well, I am quite sure that is the man.

"Q. Now, between the time of the robbery and today, have you seen that man before? A. Well, I have seen him twice before. I was asked to go to the jail and see if I could identify the man that held me up, from a group of other men, and I saw him at that time.

"Q. Did you pick this man out as the man who was in your store? A. Yes.

"Q. Where else did you see him? A. At the preliminary hearing I saw him.

"Q. Did you identify him there as the man who entered the store and held a pistol on you that evening? A.

Yes, I did identify him in the same way I have here."

And upon cross-examination he further stated:

"Q. You also stated there that if it meant a man going to the penitentiary that you couldn't say it was him, didn't you? A. I don't believe those were my words.

"Q. What were your words? A. I believe I said if it were a matter of a lesser nature I would definitely state it was him, but since the man's freedom was involved, I would have to put it that other way; if it wasn't him, it was a man that looked just like him.

"Q. But you did state if it wasn't him it was a man that looked like him? A. Yes. * * *"

"Q. Now, summing this up, what can you say except that this man was tall and thin, that you could identify this man by? A. Well, I think when you are held up like that, probably the man's face and expression register more with you than actual physical measurements and things. It seems to me I remembered his face, which is the thing you remember about a person.

\* \* \* \* \* \*

"Q. Prior to the preliminary, you had seen the man and you had seen him again. At none of those times immediately after, let alone this period of four months later, at none of those times you couldn't identify the man; he just looked like the man, isn't that right? A. I stated at the hearing I couldn't positively * * * I didn't like that word * * * I had a slight reservation. I wasn't able to use that word 'positively'. I objected to the Judge at that time about that word."

Upon being further interrogated as to the "police lineup", Gorby stated:

"Q. You don't recall whether there was any other tall, thin man there or not. So far as you know, this may have been the only tall, thin man; is that right? A. I do recall I didn't pick this man out just because of his height; *it was his face that I noticed*." (Emphasis supplied.)

Ronald Heiss, a 16-year-old boy, whose father owns a tavern across the street from the Desert Beverages store, testified he was at his father's place of business some time between 9:00 and 10:00 p.m. the evening of the robbery; that he stepped outside and in the semi-darkness observed a Buick car parked parallel to the side of the bar.

"Q. What did you notice about this car? A. Well, there was a tall man on the other side of the car, leaning over, and talking to another man, and he noticed me out there, and he come around the car and he said to me, 'Have they got good beer over here,' or

there? I don't know which he said, 'over here' or 'there', and I said, 'Yes,' and he got in the car and closed the door and drove away. * * *"

This boy further testified he noted the number appearing on the license plates of the Buick car and that he wrote it down on a slip of paper which was later given to the officers. We quote:

"Q. * * *. Do you recall the license, what you wrote on the paper? A. I believe it was '5451'. I was pretty leary about the last number of the license plate. I thought possibly of it being a six.

"Q. You weren't quite sure what the last number was? A. No, I am not quite sure.

"Q. And the letter preceding the first number * * * A. I believe it was a 'C'. * * *"

"Q. I will ask you to look at the man seated at the table behind me with the blue jacket on; do you think you have ever seen that man before? (indicating defendant) A. Well, he was tall like that man.

"Mr. Gasser: I object, Your Honor; just answer the question.

"Q. Answer my question: Do you think you ever have seen this man before? A. If yon don't, say you don't know. A. I don't know; I am not sure."

Then on cross-examination these questions were asked and answers given, viz.:

"Q. Now, Ronald, this car, this license number you took down, you actually got three numbers off of it, didn't you? A. Well, I got everything written down, but I told the officer the last number might be '6' or so, because I wasn't sure; just getting a glance. I had a picture of the license plate. I practically had it memorized.

"Q. But you are uncertain about the last number? A. Yes, sir, I am."

Deputy Sheriff Steward testified that in response to a telephone call reporting a gun left as security for a tire-repair job, he investigated and located defendant and a shorter man at a junk yard near Tucson. This was some time in the month of August, 1956. The officer stated that defendant was in possession of a Buick sedan car, which bore license No. C-54515. The original license plates and several photographs of the car were admitted in evidence. Defendant claimed ownership, though he had no papers to prove same. The officer further testified:

"A. * * *. I asked them their names, and then I called in for the number to find out if it was issued to that car, and it was not; this license was not issued.

"Q. Did you ask the gentleman his name? A. Yes, sir.

"Q. What name did he give you?
A. William Gray.

"Q. Is that the defendant here?
A. Yes, sir."

There is somewhat of a dearth of authority in this jurisdiction on the law governing identification; however, by independent search we find that in the case of La Grange v. State, 26 Ariz. 102, 222 P. 414, 415 (there the question involved was identification of a dead body), this court quoted with approval the following:

"'On questions of identity, it is not necessary that a witness should swear' positively and 'pointedly; it is only necessary and is of common occurrence, for them to swear that they believe the person to be the same, and the degree of credit to be attached to their evidence, is a question for the jury.' State v. Dickson, 78 Mo. 438; Greenwell v. Crow, 73 Mo. 638; 1 Greenleaf Ev. 440; 3 Greenleaf Ev. 133."

Turning to reported cases from other jurisdictions it appears to be well settled that identification of a defendant, necessary to support a conviction, need only comply with the requirement of proof beyond a reasonable doubt. Uncertainty of identifying evidence goes to its weight, rather than its admissibility.

"In order to sustain a conviction it is not necessary that the identification of the defendant as the perpetrator of the crime be made positively or in a manner free from inconsistencies. It is the function of the jury to pass upon the strength or weakness of the identification and the uncertainness of the witness in giving her testimony." People v. Houser, 85 Cal.App.2d 686, 193 P.2d 937, at page 941.

In accord: People v. Cahan, 141 Cal.App. 2d 891, 297 P.2d 715.

"Generally speaking, the identification of the person charged with the commission of the offense is not required to be established by direct or positive evidence. The witness, upon his examination, may testify that he believes or is of the opinion that the accused is the person who committed the crime. His means of knowledge, however, or the facts upon which he bases his belief or opinion, in respect to the identity of the accused, may be thoroughly tested or disclosed upon cross-examination. The weight or degree to be given the testimony of such witness or witnesses is a matter for the determination of the jury or court trying the case (citing cases)." Craig v. State, 171 Ind. 317, 86 N.E. 397, 400. Accord: Medsker v. State, 224 Ind. 587, 70 N.E.2d 182.

Turning to the text writers on the subject of identification, we quote from

Nichols, Applied Evidence, Vol. 3, section 28 (p. 2503), (1928):

"The identity of one charged with crime may be established by natural and reasonable inferences deducible from proven facts, and may rest wholly on circumstantial evidence. It is not necessary that the identification of defendant as the person who committed the crime be made positively by any one witness, but it is a matter for the jury to determine from all the circumstances and evidence on the subject. Testimony of witnesses that they believe defendant is person they saw commit the crime is sufficient to sustain conviction."

See also the following: Conrad, Modern Trial Evidence, Vol. 1, section 639 (1956); Elliott, Evidence, Vol. 4, section 2715 (1905); Underhill's Criminal Evidence, Vol. 1, section 127 (5th Ed. 1928); Wharton's Criminal Evidence, Vol. 1, sections 181 and 182 (12th Ed. 1955); 23 C.J.S. Criminal Law § 920, p. 192.

People v. Fiorita, 339 Ill. 78, 170 N.E. 690, upon which defendant so strongly relies, is readily distinguishable and, in our opinion, is not contra to the authorities cited above.

■ Applying the legal principles above set forth to the facts heretofore recited, we have no hesitancy in holding that there was sufficient competent evidence presented to the jury from which they might find, as they did, that one of the persons committing the robbery was none other than defendant. The learned trial court, therefore, did not err in refusing to take the case from the jury. Furthermore, before the case was finally submitted the jury were instructed as to the legal requirements for identification.

■ Finally, defendant contends the trial court committed reversible error in admitting, over objection, the testimony of Louie Silverman to the effect that the Buick car found in possession of defendant at the time of his arrest was then, and at all times pertinent hereto, owned by him and had been taken from his used car lot without permission. Clearly the inference was left with the jury that defendant had probably stolen the car in question. This, defendant maintains, tended to prejudice the minds of the jury, by innuendo. The State seeks to justify the court's ruling in admitting such evidence upon one or more of the following theories, viz.:

(a) as tending to identify the accused;

(b) a circumstance tending to show the guilt of defendant on the robbery charge since it is well known stolen cars are often used as "get away" cars;

(c) admissibility under "the common scheme or plan" exception to the rule that evidence as to other offenses is not admissible;

(d) rebuttal of defendant's claim of ownership of the Buick car.

Each of the State's theories, except (d) which is clearly an effort to impeach on a collateral matter, touch but are not embraced by the exceptions to the oft-stated rule as to inadmissibility of evidence showing the defendant had or may have committed other crimes. We hold the court improperly admitted Mr. Silverman's testimony as it had no probative value in establishing the guilt of defendant in the instant case. Does it necessarily follow that the judgment must then be reversed and a new trial granted? We think not.

"* * * No cause shall be reversed for technical error in pleading or proceedings when upon the whole case it shall appear that substantial justice has been done." Art. 6, Sec. 22, Constitution of the State of Arizona, A.R.S.

In applying this constitutional provision our prior decisions, particularly in Turley v. State, 48 Ariz. 61, 59 P.2d 312 and State v. Singleton, 66 Ariz. 49, at page 66, 182 P.2d 920, at page 930, have laid down this test: had the error pointed out not been committed is there reasonable probability that the verdict might have been different? In answering this question, the members of this court must necessarily put themselves, as nearly as possible, in the position of the jury in order to determine whether, as reasonable men, the error committed probably affected their verdict. Considered in this light—particularly since the same inuendo of theft was raised by the testimony of Deputy Sheriff Steward—we conclude that there is no reasonable probability that a fair-minded jury would have arrived at a different verdict from what it did had such evidence been excluded.

Judgment affirmed.

WINDES, PHELPS, STRUCKMEYER and JOHNSON, JJ., concur.